EDWARD TURNER and BENJAMIN T. CHEESMAN, executors
of the will of Peter Cheesman, deceased, appellants, *and*
WILLIAM J. CHEESMAN, respondent.

The presumption of law is in favor of testamentary capacity, and he who
insists on the contrary has the burthen of proof, except where insanity
in the testator has been shown to exist at a time previous to the execu-
tion of the will; in that case the onus is shifted, and the party offering
the will is bound to show that it was executed at a lucid interval.

The time of the execution of the will is the material period to which the
court must look to ascertain the state of mind of the testator; and al-
though it is competent evidence to show the testator's mind at any time
previous or subsequent to the execution of the will, yet such proof is
always liable to be overcome, if it be satisfactorily shown that the tes-
tator, at the time he executed the writing, had the possession of his
faculties.

The testamentary witnesses and their opinions, and the facts they state as
occurring at the time, are to be particularly regarded by the court.

The opinion of witnesses, other than the testamentary witnesses, as to
the capacity of the testator, are to be received as the slightest kind of
evidence, except so far as they are based on facts and occurrences which
are detailed before the court.

Old age, failure of memory, and even drunkenness, do not of themselves
necessarily take away a testator's capacity; he may be ever so aged,
very infirm in body, and in habits of intemperance, and yet, in the eye
of the law, possess that sound mind necessary to a disposition of his
estate.

The failure of memory is not sufficient to create testamentary incapacity,
unless it be total, or extend to his immediate family and property. The
amount of mental capacity must be equal to the subject matter with
which it has to deal: a man may be competent to make a codicil, chang-
ing in two or three particulars the prior dispositions in his will, who
would be incompetent to the performance of acts requiring the exercise
of far greater intellect and judgment.

If it be clear that the writing propounded for probate is the will of a
sound and disposing mind, the court cannot look beyond it for the tes-
tator's motives for the disposition of his property made by him. The
right of absolute dominion, which every man has over his own property,
is sacred and inviolable.—Per POTTS, judge of Orphans Court.

The mere fact of a man's having affixed his signature to a will as a sub-
scribing witness does not entitle his opinion, as to the competency of the
testator, to any more weight than that of any one else who may be
called upon to testify.

Turner *v.* Cheesman.

If the subscribing witness is a stranger, and has no opportunity to ascertain and judge of the testator's capacity, his opinion is not entitled to as much weight as that of a friend who saw the testator about the same time, and who was afforded an opportunity of conversing with him, and testing the sanity of his mind.

The opinion of any one—whether a subscribing witness or not—is of but little value, unless he can give the reasons for the opinion which he expresses.

The influence exercised over a testator, which the law regards as undue or illegal, must be such as to destroy his free agency; but no matter how little the influence, if the free agency is destroyed, it vitiates the act which is the result of it.

That degree of influence which deprives a testator of his free agency, which is such as he is too weak to resist, and which renders the instrument not his free and unconstrained act, will be sufficient to invalidate it, not in relation to the person alone by whom it is procured, but as to all others who are intended to be benefited by the undue influence.

———

This case came before the court by appeal from the decree of the Orphans Court of the county of Camden. Two papers were presented to the surrogate of that county for probate, the one purporting to be the last will and testament of Peter Cheesman, deceased, and the other a codicil thereto. Caveats against the probate of these papers were filed by William J. Cheesman. Witnesses were examined, and the Orphans Court being divided as to the admission of the codicil, an order was made rejecting it. This appeal was taken from that order. The testimony is sufficiently noted in the opinions delivered to elucidate the points decided.

*Carpenter,* for appellants.

*Voorhees* and *Browning,* for respondents.

The following opinion was delivered in the Orphans Court by

POTTS, P. J. On the ninth of February, 1853, Peter Cheesman made and executed a will, devising the farm and plantation on which he lived, among other things, to his wife for life, and the residue of his estate, with the farm, after his wife's

decease, *equally among his children living* and the representatives of those deceased.

About the 25th of January, 1856, he was attacked with a severe sickness, which terminated his life on the 24th of March following, at the advanced age of nearly eighty-six years.

During his sickness, on the 5th of March, he made and executed a codicil to his will, by which he gave the plantation, in the will devised to his wife for life, *to his youngest son John* after her decease, instead of the share given him by the will, and made two or three other alterations in the disposition of his estate.

Ten of his children survived him or left living representatives—four of them by his first wife, and six by a second.

No question is made as to the will of 1853, nor as to the *fact* of the execution of the codicil of March, 1856, but the caveator insists the codicil ought not to be admitted to probate. They object that the testator was *not of sound and disposing mind* and memory when he executed it; that it makes an *unreasonable disposition of his property;* that it makes a disposition *contrary to all his previous declarations* as to his intentions on the subject, and that it was obtained by *undue influence.*

The general rules and principles adopted by the Ordinary in the case of *Whitenack* v. *Stryker and Vorhees*, 1 *Green's Ch. R.* 11, are of controlling authority in this court as far as they are applicable to this case. They were adopted after solemn argument, and have not since been questioned, as far as I am advised, in this state. In that case the Ordinary said—

1. The first principle is, that the presumption of the law is in favor of capacity, and he who insists on the contrary has the burthen of proof, except where insanity in the testator has been shown to exist at a time previous to the execution of the will; in that case the onus is shifted, and the party offering the will is bound to show that it was executed at a lucid interval.

X *

2. That the time of the execution of the will is the material period to which the court must look to ascertain the state of mind of the testator; that although it is competent evidence to show the testator's mind at any time previous or subsequent to the execution of the will, yet such proof is always liable to be overcome, if it be satisfactorily shown that the testator, at the time he executed the writing, had the possession of his faculties.

3. That of all the witnesses, the testamentary witnesses, and their opinions, and the facts they state as occurring at the time, are to be particularly regarded by the court. They are placed around the testator for the very purpose of attesting, after his death, to the circumstances under which so solemn an instrument is executed.

4. That the opinions of witnesses, other than the testamentary witnesses, as to the capacity of the testator, are to be received as the slightest kind of evidence, except so far as these are based on facts and occurrences which are detailed before the court. Witnesses are to state the facts, and it is the business of the court, from these facts, to pronounce the opinion, upon settled rules and guides, whether the testator is competent or not.

5. That old age, failure of memory, and even drunkenness, do not, of themselves, necessarily take away a testator's capacity. He may be ever so aged, very infirm in body and in habits of intemperance, and yet in the eye of the law possess that sound mind necessary to a disposition of his estate.

The attention of the court, then, is very properly directed, in the first place, to the time of the execution of the codicil and the testimony of the attesting witnesses, to the circumstances attending the execution, and the condition of the testator when he performed the act. It appears that the codicil in question was prepared, under instructions received the day previous from the testator, by Edward Turner, who had also prepared the will of 1853, and who was, by that will, appointed one of the executors, and that said codicil was executed in the presence of Samuel D. Sharp and Jonas Keen;

Turner *v.* Cheesman.

that Sharp was the subscribing witness to the will, as well as to the codicil, and that the other subscribing witness to the will, William Taylor, had removed to the western country previous to the execution of the codicil.

Mr. Sharp testifies to the execution of the codicil in due form, and that he believes the testator at the time was of sound mind and competent to dispose of his property; that it was witnessed by him at the request of the testator, and at the testator's own house; and in his cross-examination he says, "Peter Cheesman, at the time he executed his codicil, was in a chair beside his bed; it was in the afternoon, after dinner, about the middle of the afternoon, I think; he said he did not feel well; he got up out of his bed, after I got there, to execute the codicil; I think he either got in bed, or got out of the chair, and sat on the side of the bed after he had executed it; I do not remember now whether anybody helped him up, or back into bed or not; he wrote his name to the paper with his own hand and without assistance—I saw no one assist him do it; John S. Cheesman came after me to witness the execution of the codicil. He says he saw John when he got there—he was cutting up some wood, and was carrying it into the room where the old gentleman was; he asked his father if he could do anything for him, and the old gentleman told him to get in plenty of wood, and keep the house warm; he says the codicil had been written before he got there; it was read over to the old gentleman in my presence—I heard it read to him; Mr. Turner, Mr. Keen, and I sat there talking, perhaps for an hour, before Mr. Turner asked the old gentleman if he was ready to execute the codicil; the old gentleman was lying on the bed when Mr. Turner asked him this; nothing had been said by the old man to me after I got there, except that he asked me how I was, when I went in; I replied that I was well, and asked him how he was, and he replied that he was not very well; he talked to aunt Sallie (his wife), to John and the little girl; I do not know that he talked much to me and

Turner and Keen; he laid upon the bed the whole time I was there, until the time that Mr. Turner asked him if he was ready to sign the codicil; he had his pantaloons on, but I think not his coat; I do not remember that any one helped him get up to his chair; he got up right away after Mr. Turner called him; there was a little stand near the bed; Mr. Turner had a pen and ink of his own with him; after he got up he requested Mr. Turner to read the paper, and aunt Sallie asked him if she must go out of the room; uncle Peter said no, you can stay in; then Mr. Turner read the codicil to him; John S. Cheesman was not in the room at the time; after it was read, Peter Cheesman signed it; so I do not remember that the old gentleman said anything after Mr. Turner was done reading it; Mr. Turner put the pen into the ink, and handed it to Peter Cheesman to sign the paper with, and he did the same thing for me and Mr. Keen." This witness being again examined in chief, says—when Mr. Turner read on down till he came to his son Thomas J. Cheesman to have a certain piece of land of *forty* acres, uncle Peter said, "stop and alter that, and put it *twenty* acres, and if he wants more let him buy it." When Turner read down to John S. Cheesman, Peter said that John had taken the mare to the horse, and should have the colt; he also said that John should have a certain cow. Turner made the alterations as directed.

Mr. Keen, the other subscribing witness, gives much the same account of the transactions, with a little more particularity. He says, when the testator executed the codicil, Mr. Turner requested him to place his finger on the seal, and then asked him if that was the codicil to his will; he said it was; it was read over to him before he signed; that while being read, and Turner had read down to John S. Cheesman, he said something about a cow—a black horse and cow were to be his—and told Turner to put the colt in also. When he read to Thomas J. Cheesman forty acres, testator said, " stop, I told you twenty, put that twenty—if he wants more let him buy it." Turner interlined it, brought it back, read

Turner *v.* Cheesman.

what he had written, and said it was right. He says, "I suppose I was in the room with Peter Cheesman an hour before the codicil was executed; he had laid down before we got there, and they wished him to rest; I was in little of a hurry, as it was getting late, and spoke to Mr. Turner to have the business closed; then he spoke to Mrs. Sarah Cheesman about it, and she inquired of the testator whether he had had his nap out; he said he hadn't been asleep—she said she guessed he had; he said no, he had not been asleep, for he had heard us talking; then Turner asked him if he was ready to have the codicil executed, and he said he was; after the codicil was executed I sat down by him—he had then laid down in the bed again; he said to me, 'Jonas, I have been worried about this for fear I should not get it fixed.' He then stated, that having got the codicil fixed, he was satisfied now; he reached his hand over to me, and said, I am now ready to die; he said he was ready to die before, all but that, and as that was now fixed he was ready to go just when it pleased the Lord to take him." As to the testator's competency, the witness says, "I have known Peter Cheesman for many years, and just whatever he made his mind up to he was very decisive and firm; and from the conversation I had with him that day, and a few days before, I thought he had the best mind of any man of his age I had ever known; at the time of the execution of the codicil I thought him a man of sound mind, and competent to dispose of his property; I thought his mind as good as ever it was—I saw no weakness in his mind, it was only in his system."

This evidence, standing alone, would seem to establish quite satisfactorily the testator's competency at the time of the execution. It would appear, from what he said to Mr. Keen, that he had had the matter of making this codicil on his mind, and had been anxious and troubled lest his failing health should have prevented him from accomplishing the purpose. He has it carefully read over to him; he pays strict attention to its contents; he instantly detects an error in the draftsman in giving forty acres of land, instead of

twenty, as he says he told him, to his son Thomas; he orders another alteration to be made in favor of John, and gives the reasons for it; he executes it with due formality, and requests the witnesses to attest it; he says but little, but what he does say is sensible and appropriate to the occasion and to his circumstances. There is nothing in what he says or avers at the time which indicates the slightest failure of mind, memory, or understanding, and the witnesses who saw and heard him, and whose duty it was to be satisfied of his competency before subscribing the instrument, express the most clear and unequivocal opinion that he was possessed of the requisite qualifications.

Then what is the case made by the caveators?

1. They undertake to show the testator's general incompetency, owing to age and sickness, to transact business, both before and after the act of the execution, and from these premises argue his incompetency at the time.

. Doct. Sickler, the physician who attended him from the 25th of January to the 8th of February, testifies that he looks upon him as a very old, worn out, broken up man, whose mind, as well as his body, had fallen off very much from what it once had been; that his mind was not entirely gone, but when he saw him it was with some difficulty he could bring to his recollection what had transpired a few days before. He did not always recognize the witness when he went there, and on the 29th January does not think he recognized him or anybody else, but next day he did recognize him. He says, when I saw him, I do not think he was competent to transact business; my reason for this opinion is, that I could not get him to carry out my directions, either written or otherwise, in prescribing for him; his disease was hydrothorax, or an accumulation of water in the cavity of the chest.

Doct. Sickler, it will be remembered, ceased attending the testator on the 8th February, and the codicil was executed on the 5th of March, twenty-six days later. On the 7th of March, two days after the codicil was executed, Doct. Clark

was called in to attend him as physician, and continued to visit him until his decease. When he first visited him he says, "I found him lying in his bed suffering a good deal of pain; his pulse was somewhat irregular, and his suffering was principally from some irregularity in regard to his urinal functions; he labored in his breathing from a sense of suffocation; from his symptoms, I supposed there was an effusion upon the chest around the heart, or some organic affection of the heart; his mind, on my first visit, appeared to be perfectly clear—I judged so from his recognizing me and conversing with me about a matter that had occurred a good while before; it had been a long time since I had seen him before, and some fifteen or twenty years since I had previously attended him; he spoke of the circumstances attending my last visit to him as his physician, and of the cause of his illness at that time; he said he hoped I should be able to relieve him, but that he had his doubts about it, as he was an old man, and he then stated to me his age; his disease had no direct connection with his mind, and could not affect his mind directly as fever would; I saw nothing about about his case that would lead me to doubt his competency to make a will." He visited the testator again on the thirteenth and seventeenth of March—conversed with him—should say his intellect was clear. The witness says the severe oppression of which I speak is not constant in such cases; it was not so in his case; it arises from the imperfect oxygenation of the blood, while its circulation is impeded through the lungs; I am willing to say that his disease was one not calculated to affect the mind, or not to have much effect upon the mind.

Taking the evidence of Doctor's Sickler and Clark together, it does not impair the strength of the case made by the attesting witnesses. It is shown that the disease was not calculated directly to affect the mind; that the testator was better two days after the codicil was executed than he had been several weeks before, when Doct. Sickler attended him, and that he did not, at that period nearest the time of the

execution, exhibit anything like a want of intellect or testamentary capacity. The disease was of a character, too, which explains a good deal of the testimony in the case, such as his indisposition at times to converse or to use any exertion. The painful sense of suffocation incident to the imperfect oxygenation of the blood, from the failure of the lungs to perform one of their most important functions, would naturally dispose the patient to avoid effort and excitement, and desire as perfect and undisturbed quiet as possible. Doct. Sickler says the disease of the testator was chronic. Treating of hydrothorax, · Doct. Wood says, "sometimes it comes on suddenly, and proves fatal in a short time; but much oftener it is chronic, lasting for a long time, sometimes better sometimes worse, now yeilding to treatment and again returning, until at length the patient succumbs, either under the disease in which the dropsy originated or from the effects of the dropsy itself." 2 *Wood's Pr. of Med.* 356.

Thus far we have examined the testimony of those witnesses whose *opinions* are entitled to any considerable weight in determining the question of the testator's capacity. A number of other witnesses have been examined; as to these, their opinions, in the language of Mr. Justice Washington, *Harrison* v. *Rowan*, 3 *Wash. C. C. R.* 587, are entitled to little or no regard, unless they are supported by good reasons, founded on facts which warrant them. If the reasons are frivolous or inconclusive the opinion of the witnesses are worth nothing, and neither facts nor opinions are of any weight in investigations like this, except so far as they tend to throw light on the condition of the testator's mind *at the time* of the execution of the codicil. I shall therefore only have occasion to notice the testimony of such witnesses as state facts in support of the opinion they express.

*Thomas Pilling* says he did business with testator in October or November, 1855, and he appeared to be competent then to attend to business as he had ever been—witness knew him first in 1849.

*Jacob Johnson* knew testator for three years, was with him

a good deal during his last illness, sat up with him several nights; part of the time he appeared rational and part of the time appeared to know nothing, and talked strange. One evening, about four weeks before he died, I was there; he talked very strangely; he called to his wife, and wanted her to get up and wait on him; she told him she could not wait on herself—she was utterly unable to get up; he wanted to know what ailed her, and she told him that he knew that she was lame; then he began calling for his son John, but she insisted he should let him alone, as he had had no sleep for several nights; he then commenced calling for me— I was standing in the room at the time; I told him I was up —but he kept on calling for me, and told me to get wide awake, that he wanted to talk to me; I put my hand on his shoulder, and told him I was there, but he still kept calling for me two or three minutes—this was before the 4th of March. Witness says he was there three or four times even after that—sometimes staid part of the evening, and sometimes all night; sometimes testator remained pretty quiet, and continued so all the evening, at other times he would call for John and others, and when they would come to him he did not want anything; if he was uneasy, he was raving in the way I have stated. The witness says, before he was so sick as to require sitting up with, he did not notice anything of his being out of his mind.

*William C. Garwood,* who was a son-in-law, visited the testator but three times during his last sickness. The first time he appeared to be very low, the second, to have his proper mind as much as could be expected for a man of his age and as sick as he was. The second time was on the 24th of February; he was then quite low, did not talk or take notice, but knew the witness, and answered a question or two rationally. The last visit was eight or ten days before his death, and the testator was then quite low, and did not recognize the witness. These visits were made, it will be perceived, the second more than a week before, and the third one over a week after the codicil was executed.

Several other witnesses were examined, who visited him ore or less frequently during his sickness, and sometimes s up with him.

..aking all the testimony upon this subject together, it exhibits nothing that might not naturally have been expected in the mental and physical condition of a patient gradually sinking under the effect of a painful but fluctuating disease. Sometimes he would take little or no notice of those about him, sometimes he appeared restless and his mind particularly affected, sometimes he was better, and then his mental powers recovered their tone. Nothing indicating *permanent* alienation or derangement of intellect is shown, and the whole testimony is perfectly consistent with the fact, sworn to by the attesting witness, that on the 5th of March, at the time the codicil was executed, his testamentary capacity was equal to the occasion for which it was called into exercise. The witnesses who speak of his situation on the night of the eighth of March, John Zane and Harrison Cheesman, gave very much the same testimony as Jacob Johnson; and there is nothing in their evidence which renders it either impossible or improbable that, in the afternoon of the 5th, he was of sound and disposing mind and memory. Andrew J. Ware, a grandson, saw him on the 4th, but the old gentleman did not recognize him, and when told who it was, said, "how are you Jacob?"

Ann Hurff saw him between seven and eight o'clock on the evening of the 5th, after the codicil was executed; she says he did not know her; that two of his grandchildren, Amanda and Rebecca Cheesman, were there, and he did not know them; Mrs. Hurff went to his bed, and asked him how he was, and he said, I do not know you; I told him who I was, and he made no reply. The grandchild went to his bed, and precisely the same scene is acted over again. Charles Billings and the girl Emmeline, who say they saw him on the 5th, and the latter waited on him, speak of his not knowing people, not speaking, not appearing to know anything. But testimony of this character amounts to very little when opposed

to the positive evidence of the attesting witnesses. A sick man laboring under a physical disease, which exertion of any kind aggravated, and exposed constantly to visits and addresses which tended to disquiet, and probably discomfort him, may have declined the recognition of visitors for the very purpose of avoiding the necessity of conversation. It is remarkable that, though some of the witnesses express opinions that he was out of his mind, drawn chiefly from his silence, there was no one who testifies to any conduct or conversation on his part which shows decided mental alienation.

Instances are, it is true, detailed which show that his memory of recent transactions was sometimes at fault; but this is incident to old age. It does not appear but that at all times, when able to converse at all, he perfectly understood and comprehended the nature and extent of his property and the circumstances and relations of the objects of his bounty.

It is in evidence, too, that the disposition he made of his homestead farm, in the codicil of the 5th of March, was different from that which he had often before indicated as his intention. But this alone is no evidence of imbecility. Men of sane mind, young as well as old, in health as well as in sickness, often do this. He may have had good reasons for what he did. The preference in this case was of his youngest son, who had always lived with him. To most, if not all the elder children, he seems to have made advances in his lifetime, and so far as the case is before this court, it is not clear that the final disposition of his estate was to any great extent unequal; for it is by no means certain that the devise of the homestead farm embraced any of the new land, and unless it did, the inequality is not very great.

No importance at all is to be attached to the mere opinion of witnesses who are interested in breaking the codicil, and very little to the testimony as to the declarations of Turner, the executor. The caveators could have called him as a witness, and declined to do so, and this fact, taken in connection with the questionable character of the evidence as to what he said, detracts very much from its weight.

There can be no serious doubts entertained that, up to the time of the commencement of his last sickness, the testator had capacity enough to make a will, certainly no previous act or word of his is shown that ought to create a doubt about it· Nor am I able to find, from the evidence of anything he said or did during his sickness, that his mind was permanently prostrated, or his reason entirely overthrown by it. That he was occasionally greatly reduced in physical ability; that he was sometimes so low as to be unable or unwilling to converse; that there were occasions when he seemed insensible; that in certain paroxysms or stages of suffering he was irritable, restless, and childish in his conduct and expressions, or even appeared to be unnatural, are all phenomena of common occurrence in cases of severe illness; but they no more fix the permanent condition of the mind than the occasional delirium of a fever, or the prostration and temporary insensibilities of catalepsy. This species of evidence may always be overcome by the clear and conclusive evidence of subsequent sanity—sanity at the time of the performance of the act in question.

The law looks only to the competency of the understanding, and neither age nor sickness, nor extreme distress or debility of body, will affect the capacity to make a will, if sufficient intelligence remains. The failure of memory is not sufficient to create the incapacity, unless it be quite total, or extend to his immediate family and property. The amount of mental capacity must be equal to the subject matter with which it has to deal: a man may be competent to make a codicil, changing in two or three particulars the prior dispositions in his will, who would be incompetent to the performance of acts requiring the exercise of far greater intellect and judgment. *Vanalstine* v. *Hunter*, 5 *Johns. Ch. R.* 148; *Harrison* v. *Rowan*, 3 *Wash. C. C. R.* 580.

Or, as was said by Washington, J., in *Stevens* v. *Vanclève*, 4 *Wash. C. C. R.* 267, " He must, in the language of the law, be of sound and disposing mind and memory. He must have memory. A man in whom this faculty is totally extin-

guished cannot be said to possess understanding to any degree whatever or for any purpose. But his memory may be very imperfect; it may be greatly impaired by age or disease. He may not be able at all times to recollect the name, the persons, or the families of those with whom he had been intimately acquainted; may at times ask idle questions, and repeat those which had before been asked and answered, and yet his understanding may be sufficiently sound for many of the ordinary transactions of life. He may not have sufficient strength of memory and vigor of intellect to make and digest all the parts of a contract, and yet be competent to direct the distribution of his property by will. This is a subject which he may have often thought of, and there is probably no person who has not arranged such a disposition in his mind before he committed it to writing. The question is not so much what was the degree of memory possessed by the testator as this, had he a disposing memory? Was he capable of recollecting the property he was about to bequeath, the manner of distributing it, and the objects of his bounty? To sum up the whole in the most simple and intelligible form, were his mind and memory sufficiently sound to enable him to know and to understand the business in which he was engaged at the time when he executed his will?"

Great stress has been laid upon the inequality in the disposition of the testator's estate, as created by the codicil; and the evidence that the testator had previously, on several occasions, expressed an intention to devise his estate equally among his children. If we are clear that this is the testator's codicil, and expresses the will of a sound and disposing mind, we cannot look beyond it for his reasons or his motives for doing what he did. The right of absolute dominion which every man has over his own property is sacred and inviolable. The argument is only legitimately applicable so far as it affects the question of the testator's capacity at the time.

But the force of the argument itself depends chiefly on

Y *

the construction which the caveators put on the language of
the clause in the codicil devising the homestead farm to
John. They contend that it embraces a real estate worth
some $22,500, while the proponents of the codicil construe it
as only conveying the cleared arable land; worth some $5000.
If the latter construction be the true one, the inequality, as
before observed, is not so great as to cause surprise. It was
in favor of the youngest son, for whom no previous provision
had been made, who had always lived at home, and was
under age and unmarried. The other children seemed all
to have been settled, and several of them, at least, had had
advances of land. Then, as to the testator's previous decla-
rations of his intentions to divide his property equally, I
have already referred to the fact, that he expressed himself
at the time he executed the codicil, or immediately after, as
having for some time contemplated the change in question,
and having been anxious and troubled lest he should not
have lived to make it.

Upon the whole case, I am clearly of the opinion that the
caveators have failed to show want of capacity to execute
the codicil on the 5th of March, and that it ought to be ad-
mitted to probate.

THE ORDINARY. On the 9th of February, 1853, Peter Chees-
man executed a writing as his last will and testament. On
the 4th of March, 1856, he executed a paper, purporting to
be a codicil to his will of February, 1853. On the 25th of
March, 1856, he died. The above instruments of writing were
offered for probate to the surrogate of the county of Camden.
To the proof of the will dated February, 1853, no objection
was made. The respondent filed a caveat against probate of
the codicil. After investigation before the Orphans Court of
the county of Camden, the judges being equally divided as to
the admission of the codicil to probate, an order was made
rejecting it. This is an appeal from that order. After a
careful examination of the evidence, I think the order made

by the Orphans Court was erroneous, and that the codicil should have been admitted to probate.

By the will of 1856, the decedent devised his homestead farm to his wife during her life, and at her death to be equally divided among his children. By the codicil, he devises his homestead farm, after the death of his wife, to his son, John S. Cheesman. This is the only material difference made by the codicil, and has given rise to this controversy.

The grounds of objection made to admitting the codicil to probate are two—first, that the testator, at the time of its execution, was not of sound and disposing mind and memory; and—second, that while his mind was debilitated and distracted by the disease under which he was suffering, his two sons, Benjamin and John, took advantage of the testator's situation, and by exerting an undue influence, induced the execution of the codicil.

On the 25th of January, 1856, the testator was taken ill of the sickness of which he died. It was a chronic affection, designated by the physicians *hydro thorax*, or an accumulation of water in the cavity of the chest. The disease is one fluctuating in its character; but in the case of the testator was so violent as, upon a man of his age, to leave no hope of a permanent cure. He was about eighty-five years old at the time of his death.

There certainly is nothing in the evidence to justify the entertainment of a doubt as to the entire competency of the testator to make a will prior to his last sickness. Our inquiry, therefore, is confined to a very limited period—that intervening between the 25th of January, 1856, and the 25th of March following, which was the day of the testator's death. It was in this interval of time that the codicil was executed.

I think this is one of those cases which must depend very much upon the testimony of the subscribing witnesses—and for this reason; there is no pretence, or at any rate no evidence, to justify taking the ground that there was any permanent continued derangement or prostration of mind, such as would render the testator incompetent to make his

will. *Jacob Johnson,* one of the strongest witnesses for the *caveat,* and upon whom the respondent places much reliance, says, he was with the testator a good deal during his last sickness, and sat up with him several nights—*part of the time he appeared to be rational,* and part of the time appeared to know nothing. He further says, before he was so sick as to require sitting up with, I did not notice anything of his being out of his mind.— *William C. Garwood,* the son-in-law of the testator, a witness for the *caveat,* says, when he saw the testator, six weeks before his death, he seemed to have his proper mind as much as could be expected for a man of his age, and as sick as he was.—*John Lane* says, he could not say the old man was right all the time, or wrong all the time. This is a fair specimen of the evidence of the witnesses who were sworn in support of the *caveat.* Most of the witnesses examined on behalf of the caveator have their feelings enlisted in this controversy. They are nearly connected with the family, and certainly feel a desire to defeat the codicil. I am doing, and intend them no injustice in saying this; for I could not fail to notice in this case, in reference to, I think, all the witnesses who were in a position to feel an interest in the controversy, that they did not deny nor attempt to conceal upon which side their feelings were enlisted. I place more reliance upon their evidence for their candor in this particular.

What was the state of mind of the testator on the 5th of March, 1856, the date of the codicil? The will of 1856 was drawn by Edward Turner, and he also drew the codicil. Mr. Turner's character for probity and as a man of intelligence is not questioned. He was named as one of the executors in the original will. He is in no way interested in the question that has arisen as to the codicil. Whatever may be the issue as to it, his executorship is not affected. He does not appear to have taken any part in this controversy, and has not manifested any interest in favor of any of the parties. He has not been examined as a witness; but it is something in favor of the validity of the codicil, that it was drawn by him. As

he was well acquainted with the testator, and possessed his confidence, and was intrusted by him to draw and execute his will, we cannot suppose that he would have drawn a codicil, and have permitted the testator to have executed it at a time when he was not competent to dispose of his property. We have the fact that, on the day before the will was executed, Mr. Turner went to the testator's house, and received his instructions as to drawing the codicil. What transpired at the time, or who was present when the instructions were given, if any one besides Mr. Turner, there is no witness who testifies. The fact of the testator having himself given instructions to Turner appears from a remark made at the time of the execution of the codicil. When Mr. Turner, in reading the will, read *forty* acres, the old man interrupted him, and said, "I told you *twenty*."

The witnesses to the codicil are Samuel D. Sharp and Joseph Kean. We have the opinion of both of them, that at the time of the execution of the codicil the testator was competent. They detail all the circumstances that took place at the time; and, as related by them, what then transpired would seem fully to justify the opinion they formed as to his competency. The mere fact of a man's having affixed his signature to a will as a subscribing witness does not, it appears to me, of itself entitle his opinion, as to the competency of the testator, to any more weight than that of any one else who may be called upon testify. If the subscribing witness is a stranger, which is sometimes the case, called upon to meet the exigency of the moment, and having no opportunity in a sick chamber to ascertain and judge of a man's capacity, his opinion is not certainly entitled to as much weight as that of a friend who saw the testator about the same time, and who was afforded an opportunity of conversing with him and testing the sanity of his mind. The opinion of a subscribing witness is entitled to weight from the same consideration as that of any other man who is not a subscribing witness. The means which he enjoys of forming a correct opinion gives weight to his opinion. The opin-

ion of any one—whether a subscribing witness or not—is but of little value, unless he can give us the reasons for the opinion he expresses, and can show that he had an opportunity to justify him in forming the opinion he expresses. If the subscribing witnesses are acquaintances and friends of the testator, familiar with his peculiarities; and if, added to this, they are men of intelligence, and at the time were afforded an opportunity of judging of the testator's state of mind, their opinion would be entitled to very great and controlling consideration. It is often said that subscribing witnesses are those called by the testator himself to attest to his capacity; and that, on this account, the law attaches great weight to their opinion. But it most frequently happens that a testator gives it very little thought as to who are the witnesses of his will, and in fact has nothing to do with selecting them, but leaves it altogether to the scrivener who draws his will. An individual, called into a sick chamber to witness the will of an invalid, would be thought destitute of good breeding and impertinent should he propound any question for the purpose of testing the sanity of the man whose will he is called upon to attest. Such an occasion is regarded as a mere business one, and is despatched with little ceremony, and most frequently without any opportunity being afforded of judging of the state of mind of the man who executes the instrument. Whether a subscribing witness or not, we must look at the intelligence of the man, and the means he enjoyed of forming the opinion which he advances, and give weight to his opinion accordingly.

In this case both the witnesses were friends of the testator of long standing, and they had the opportunity afforded them of ascertaining the state of mind of the testator at the time of the transaction of which they testify. Mrs. Cheesman, the wife of the testator, and Mr. Turner, the scrivener, were present with the witnesses, and they all saw the will executed It was not done in haste, but in a manner and under circumstances that afforded a full opportunity of judging whether the testator at that time understood the business he was

transacting, and was capable of performing it. *Samuel D. Sharp* was a subscribing witness to the will to which this was a codicil. He was therefore a very suitable person to be called upon as a witness to this instrument. The testator recognized the witnesses, and conversed with them. He gave directions to his son to get in wood, and keep the house warm. The codicil was read over to him. His wife asked him if she should go out of the room. He answered, "no, you can stay in." The testator stopped Mr. Turner twice while he was reading the codicil, and had alterations made, and gave his reasons for the alterations, and in both instances gave evidence of memory and understanding. After the alterations were read over to him, he said they were right.

After the execution of the codicil, the witness, James Kean, sat by the bedside, and conversed with the testator. He said, addressing the witness, "Jonas, I have been worried about this, for fear I could not get it fixed." He then stated that, having the codicil fixed, he was satisfied. He reached his hand over to the witness, and said, "I am now ready to die; I was ready before—all but that." The witness says he had been acquainted with the testator for twenty years; that he was a a man of decision and firmness; and from the conversation he had with him that day, and a few days before, he thought he had the best mind of any man of his age he had ever known.

We have here the testimony of three intelligent and disinterested witnesses in favor of the competency of the testator at the time the codicil was executed. Although Mr. Turner was not examined as a witness, the position he occupies towards all the parties—the fact of his receiving the instructions as to the codicil the day before its execution, and his presence at the time superintending its execution—is testimony as strong in favor of the testator's competency as if he had given direct evidence to that effect as a witness upon the stand. In corroboration of these witnesses, we have the testimony of Doct. Clarke. From the 8th of February to the 7th of March, the testator had no attending physician. Doct. Clarke was called in, and visited him for the first time on

the 7th of March, and attended him as his physician to the time of the testator's death. He testifies that at his first visit the testator's mind was perfectly clear; that his dissease had no direct connection with his mind, and would not affect his mind directly as fever would; that he saw nothing about his case which would lead him to doubt his competency to make a will; that on the 13th of March, when he next visited him, he found him pretty much the same as at his first visit, and so again at his next visit on the 17th of the same month; that on the 20th he was worse; on the 23d he was insensible; on the 24th he died. He explains the characteristics of the disease, which explanation reconciles the testimony of the witnesses, who declare that at the times they saw him he was incompetent to make a will, with the testimony of the subscribing witnesses, that when he executed the codicil he was competent. It appears to me that there is nothing in the evidence which has been adduced on the part of the caveator to invalidate the evidence of the subscribing witnesses, and that it is proved, beyond any reasonable doubt, that the testator, at the time he executed the codicil, was of sufficient sound mind, memory, and understanding to dispose of his property by will.

As to the other objection against admitting the codicil to probate—that the codicil was induced by undue influence—I do not think there is any evidence to justify the charge. There is no evidence that Benjamin or John ever, at any time, had any conversation with their father about making his will. The facts that Benjamin once said he was going to try to make his father give John the homestead; that when it was alleged his father was out of his mind John denied it; that John lived with his father, and was kind and attentive to him; that he went after the witnesses to attest the will; that John said his father was going to make his will in February, 1853, (which was the time the first will was executed); and that Edward Turner was coming up for the purpose; that Benjamin wanted the old man to sell his timber to pay his debts, and influenced him in reference to the management

of his property—these are all the facts, or the principal ones, relied upon to show undue influence. They amount to nothing in establishing the allegation, that the codicil in question was the result of undue influence, exerted either by John or Benjamin over their father. Such are not the influences which the law regards as undue or illegal. The influence must be such as to destroy the free agency of the man over whom it is exerted, whether threats of bodily harm or unceasing importunities to a man on his death bed, or by act of unkindness, when the subject of it is in the power and at the mercy of another; if the individual occupies a position towards another, dependent upon him for their little attentions and conveniences, which alone make life supportable, so that he cannot say *no* to a mere request that is made of him; no matter how little the influence, if the free agency is destroyed, it vitiates the act which is the result of it. " A testator should enjoy full liberty and freedom in the making of his will, and possess the power to withstand all contradiction and control. That degree, therefore, of importunity or undue influence which deprives a testator of his free agency, which is such as he is too weak to resist, and will render the instrument not his free and unconstrained act, is sufficient to invalidate it, not in relation to the person alone by whom it is so procured, but as to all others who are intended to be benefited by the undue influence." 5 *Gill & Johns.* 302. In this case there is no proof at all of either John's or Benjamin's attempting in any way, by word or deed, to exert any influence over their father in reference to the disposition of his property.

It was proved that the old man repeatedly declared that it was his intention to divide his property equally among his children. This evidence was objected to. The evidence is competent. Where the sanity of the testator is in question, and where undue influence is sought to be established, it is competent to give in evidence the declarations of the decedent to show that the disposition of his property by the writing which is propounded for probate is in opposition to

his intention, as manifested by his repeated declarations upon the subject. The declarations in this case amount to nothing. If the codicil had not been made, the disposition of the testator's property, by the will of February, 1853, was as inconsistent with his repeated declarations, as proved, as is the disposition made of his property by this codicil. All his children had been advanced from time to time in real estate, except his son John; and whether John gets more by the codicil than some of the other children received by advancements, is a matter of doubt and dispute.

I think that the competency of the testator is established, and that the allegation of undue influence is not proved. The codicil was executed with all the formalities required by law, and is entitled to be admitted to probate.