Creveling *v.* Fritts.

HENRY CREVELING et al.

*v.*

JOSEPH A. FRITTS et al.

1. A trustee can, in no case, and under no circumstances, become the purchaser of the property he is entrusted to sell, so as to acquire a title which he can maintain against his *cestui que trust.*

2. No man can set aside the law by his deed or will. He may make any disposition of his property he sees fit, provided he does not attempt to contravene or overthrow the law.

3. A trustee can do nothing not authorized by the terms of his trust.

4. A trustee, after he has made an actual sale, in good faith, of the trust property to a third person, may afterwards purchase it of such person and acquire a good title to it.

5. If a sale is shown to have been fair and honest when made, and that no fraudulent purpose then existed, it cannot be overthrown by subsequent acts or purposes.

On final hearing on bill and answer, and proofs taken in open court.

*Mr. John N. Voorhees,* for complainants.

*Mr. John T. Bird,* for defendants.

VAN FLEET, V. C.

The main object of this suit is to set aside the titles of four persons who claim to hold parts of the lands of which Joseph Fritts died seized, under deeds made in pursuance of authority given by his will. Mr. Fritts died in March, 1879. The beneficiaries under his will are his widow, his six children, and four grandchildren, the children of a deceased daughter. By his will, he directed that all his estate, both real and personal, be disposed of as soon after his decease as his executors should judge for the

best interest of his estate, either at public or private sale, as they, or a majority of them, might think best. For his widow he made provision in these words:

" I will and bequeath to her, during her natural life, the interest of $7,000, in lieu of her dower, to be secured on first bond and mortgage, in her name, she to hold the bond and mortgage on the farm where my son Emanuel now lives, commonly called the old Shurts farm."

His will then directs:

" If the above-described farm should be bought by any of my children, my wife is to receive six per cent. interest, and she to pay the annual taxes that may be assessed on said $7,000; but if said farm is sold to a stranger, my wife to receive legal interest thereon."

The residuum of his estate is given to his four sons and three daughters. One of his daughters having died in his lifetime, her four children succeeded to her rights under the will. His four sons, Joseph, Stires, Emanuel and Oliver, were appointed executors, and all proved the will and entered upon the discharge of their duties.

The parties prosecuting this suit are the four grandchildren, and the persons holding the titles sought to be invalidated are three of the executors, namely, Stires, Emanuel and Oliver, and the fourth is Mrs. Margaret Fritts, the wife of one of the executors. The portions of testator's land held by each may be described as follows: Oliver has the homestead farm; Emanuel the old Shurts farm, the one upon which the $7,000 set apart for the use of the widow was to be invested; Stires has the storehouse property and a wood-lot; and his wife, Mrs. Margaret Fritts, the flax-mill property.

The ground upon which the court is asked to nullify these titles is that each of the executors has procured a part of the real estate he was authorized to sell for the benefit of others, as well as himself, to be sold to himself for less than its fair value. In other words, being agents to sell the testator's lands for the benefit and advantage of others beside themselves, they have sold it to themselves, for less than its fair value, and thus, though the testator directed by his will that an equal distribution of his prop-

erty should be made among all the children, these, by a betrayal of the trust committed to them by their father, have obtained more than their fair share.

If it be true that these executors have sold any portion of the testator's real estate to themselves—whether they did it openly and directly, or secretly and clandestinely, by any sort of evasion or artifice—it is clear that the law will not permit them to hold it, even though it may appear they have paid more for it than it was fairly worth. The law upon this subject is settled. A trustee, whether he be called an executor, administrator, or by any other name, can, in no case, and under no circumstance, become the purchaser of the property he is entrusted to sell, so as to acquire a title which he can maintain against his *cestui que trust*. The ground upon which this disqualification of the trustee rests is no other than that principle which declares that the same person cannot be both judge and party. *2 Sug. on Vend. 888.* A trustee to sell is always charged with the duty of deciding several important questions—as, for example, When is the best time to sell? What steps are necessary to be taken to secure an advantageous sale? And what is a fair price for the thing to be sold? Now, if he is permitted to bring to the decision of these questions the self-interest and bias of a purchaser, is it likely that the interests of the *cestui que trust* will be as carefully considered and as sedulously protected as if he stands stripped of all bias which can in any way antagonize the interests of his *cestui que trust?* The law declares that human nature is too weak and selfish to permit even the best of men to be judges in their own causes, and it therefore says that he that is entrusted with the interest of others cannot be allowed to make the business an object of interest to himself; because, from the frailty of nature, one who has the power will be too readily seized with the inclination to use the opportunity for serving his own interest at the expense of those for whom he is entrusted. He who undertakes to act for another in any matter, cannot, in the same matter, act for himself.

The situation of the trustee gives him an opportunity of knowing the value of the property, and also the necessities and straits of the *cestui que trust*, and as he acquires that knowledge at the

Creveling *v.* Fritts.

expense of the *cestui que trust*, the law requires him to use it for the benefit of the *cestui que trust*, and not to his harm.

The rule is now universal, that, no matter how fair the purchase by a trustee may be, nor how ample the consideration he pays, the *cestui que trust* is at liberty in every case to set the sale aside. Because, if a trustee were permitted to buy in an honest case, he might likewise buy in a case having that appearance, but which, from the infirmity of human testimony, might be grossly otherwise. Thus, a trustee for the sale of land may, by the knowledge he acquires in the performance of his duty, ascertain that the land has an extraordinary latent value; as, for example, that it contains a deposit of valuable minerals, or some other hidden treasure, and, locking up that knowledge in his own breast, he might purchase the land for what might seem a fabulous price, and yet get it for a mere tithe of its real value. Now, in such case, if the trustee should choose to deny the fact of knowledge, how would it be possible to establish it against him? *Lewin on Trusts 439, 461, 462.* I think it may be regarded as unquestionably true that a trustee who would enter upon the accomplishment of such a scheme, would be equal to the task of concealing the real motive which induced him to purchase. Adequate protection can only be given to the *cestui que trust* by elevating the trustee to a region where temptation never comes, and if he descends, to take from him whatever of the trust property may be found in his grasp which he cannot show, by satisfactory proof, that he obtained without any violation of the great principles which should govern his conduct.

The rule upon this subject is a wise public regulation, intended to protect a species of property which otherwise would be constantly exposed to peculiar hazard. All persons occupying the position of trustee are bound to submit to it. If they violate it, no matter how pure their intention may be, their act is voidable. However innocent the purchase may be in a given case, it is poisonous in its consequences. In all such cases, then, the trustee is forbidden to purchase, because his interest as such purchaser is opposed to the interest of his *cestui que trust*, and he acts, therefore, under a bias in his own favor. Nor, to speak in

the words of Chief-Justice Beasley, does this rule rest, to any considerable extent, in the fact that in a particular line of cases the trustee has peculiar opportunities for the practice of fraudulent acts with regard to the property in his charge. The rule, to be efficacious, must be general, and the law implies, therefore, that in all cases of trusts such opportunities may exist, and consequently the prohibition is universal. So. jealous is the law upon this point, that a trustee may not put himself in a position in which to be honest must be a strain upon him. The general rule, therefore, applies, not merely in those cases in which the confidence is absolutely betrayed, but also when the circumstances are such that there was a temptation to violate it. *Staats* v. *Bergen, 2 C. E. Gr. 558.*

When an executor or administrator consents to accept an appointment which imposes upon him the duty of making a sale of land, his acceptance constitutes a pledge that he will give to the performance of his duty his best skill, judgment and capacity. His position is one of high confidence where, for the security of the rights of those whose interests have been committed to his care, the law requires him not only to subordinate his interests to theirs, but to keep himself free from even a temptation to betray them. This is the measure of fidelity the law prescribes, and this is the measure of duty the court is bound to exact.

The test question, then, of the case is, Is it true that these executors sold the several parts of the testator's lands which they now hold, to themselves? That they made contracts, each with the others, to purchase for substantially the same prices that they ultimately paid, is an admitted fact. The lands in dispute were offered at public sale November 1st, 1879, but not sold. About a week prior to the day they were offered, Stires, Emanuel and Oliver had a meeting, at which Joseph, the other executor, was not present, and they then agreed upon the prices they would severally pay. This seems to have been a secret meeting, for Stires swears that they agreed they would tell no one what they had done. He says they did not tell Joseph, because they did not think it concerned him. At this meeting it was agreed that Stires should pay $2,000 for the flax-mill property; it was after-

wards conveyed to his wife for $2,005. Emanuel was to pay $6,500 for the old Shurts farm, and he afterwards got it for that sum. Oliver was to pay $9,000 for the homestead farm, and he afterwards got the title he now holds for $9,005.

Prior to the time this meeting was held, the executors had been informed by their counsel that they could purchase neither directly nor indirectly at their own sale, nor of themselves, so as to acquire a title which the legatees could not impeach. From the high character for learning and caution of the gentleman who acted as the legal adviser of the executors, the court is justified in believing that they were not only instructed as to the legal rule upon this subject, but also fully informed in respect to the reasons of policy and justice upon which it rests. If they were so informed, is it possible to ascribe a legitimate purpose to this secret meeting? None of the lands of the testator had then been exposed to sale; they were advertised for sale, but the executors could not know how great the demand would be for them, nor what prices they would command. They must have known that they could not appear at the sale as competitors for them, without chilling the sale; they knew that they could not even express a desire to purchase them, without exerting an unfavorable influence upon the sale. They were the lands of their father, and if it were known that they desired to buy, their neighbors and friends would be strongly disinclined to put themselves in competition with them. But more; they were the vendors and were in possession of the lands, and knew all about them, their good points and their bad, and, other things being equal, could form a better judgment as to their value than any other person. Hence, getting together before the sale, and agreeing upon prices that they thought they could afford to pay, necessarily tended strongly to make themselves the purchasers. That would, in most cases, be the inevitable effect of such a proceeding if the prices fixed by them were made known to other persons desiring to purchase. They were undoubtedly bound, in the proper discharge of their duty, to get together, either before or at the sale, and agree upon prices for which they would sell, but they were bound to come to the discharge of

Creveling *v.* Fritts.

that duty free from the bias of any interest or motive which would tempt them to undervalue the property. They were bound to go to the discharge of that duty with the same desire, so far as it is possible for one person to take on himself the rights and interests of another, to get the highest possible price, that they would do if the lands were their own.

One of the most inflexible requirements of the law concerning trustees is, that the trustee shall do for his *cestui que trust*, in the management of the trust property, precisely what he would do for himself if he were its owner in his own right.

As already stated, none of the lands in question were sold on the day they were advertised for sale, but the sale was adjourned to a future day. Two of the executors bid on the tracts they subsequently purchased, but not the full sums they had agreed among themselves to pay. The four executors and their two sisters afterwards met, on the 12th of November, 1879, and it was then agreed that the three executors should be permitted to purchase, for the prices they had agreed upon among themselves before the sale. Joseph assented to this arrangement, but with great reluctance. He thought each of the several parcels was worth more than his brothers were willing to give, and he told them that he believed they could be sold for more at a fair sale, and named the sums. He thought the flax-mill property was cheap at $2,500 ; that the old Shurts farm ought to bring $7,000, and he thought he knew a man who would give considerably more than Oliver offered for the homestead farm. His brothers adhered to the prices they had previously agreed upon among themselves, and said they would give no more.

It requires no argument to show that the three executors had, by their negotiations, placed themselves in a position where their individual interests strongly antagonized the interests of their *cestuis que trust*, and where it was impossible for them to be faithful to their duty without sacrificing their own interests. On the day of sale, Joseph requested them to offer the storehouse property as a separate parcel, and they were advised by the auctioneer to adopt that course, but refused to do so. When Joseph told them that he thought he knew a person who would

give more for the homestead farm than Oliver had offered, the announcement was received with strong disfavor; he was told to produce his man, and one of the executors says he thought it was a trumped-up story. Would this information have been received so distrustfully, and with such manifest disfavor, if the executors had all been zealously trying to sell this farm for the highest possible price? Again, some time after the meeting on the 12th of November, 1879, Joseph inquired of Oliver whether, if he found a purchaser for the homestead farm for a price greater than he had offered to give, he would surrender the farm on the 1st of April following, and Oliver replied that he would not, unless he was paid damages. I think it is impossible to scan the conduct of the three executors, even with a favorable eye, without seeing very clearly that they had a very strong desire to become the owners of the lands in controversy at prices which they had fixed before the sale as reasonable and fair, and that they regarded any project looking towards the sale of them to others, for greater prices, as unfriendly to them.

The deed to Emanuel for the old Shurts farm, it is admitted, was made in execution of the arrangement entered into on the 12th of November, 1879, and that he holds title under a contract in which he appeared both as vendor and purchaser. But for a provision of the will, it is admitted that his title could not stand. The provision referred to is the one in which the testator says that if the old Shurts farm should be bought by any of his children, then his widow shall receive six per cent. interest on the $7,000 to be invested thereon, but if the farm is sold to a stranger she shall then receive legal interest. This, it is contended, fairly construed, is an authorization to any of the testator's children, including his four executors, to purchase this farm. I think this construction is correct. It is true no express authority is given, but the implication in that direction is quite as strong as any express words could make it. This much is made clear: that the testator intended, if a child bought, he or she should hold the farm subject to a lighter annual burden than it should be required to bear if it was held by a stranger. There is no mistaking his meaning in this regard; he intended that a

distinction should be made in favor of all his children, whether they were executors or not, as purchasers of this farm, and, unless this clause is so construed, the interpretation put upon it must undeniably contravene the plainly expressed intent of the testator.

But this branch of the case presents a question of much greater gravity. Is this provision, so far as it authorizes the executors to purchase, valid ? The law gives every citizen full dominion over his property. He may do with it whatever to him may seem fit, provided his disposition of it is made pursuant to legal methods, and not in contravention of the law. That part of the will just referred to is not a devise or gift ; the testator does not say, either of my children may take the old Shurts farm, on condition that he or she pays into my estate a certain sum of money. His direction in that regard is that his executors shall sell it, either at public or private sale, as *they may deem best, when they judge it will be best for his estate.* The proceeds are to be equally divided among all his children. There can be no doubt about what was his fundamental purpose in respect to this farm— he intended that it should be sold for the highest possible price for the benefit of all his children. His love was the same for each, and he thought each had an equal claim upon his bounty. He certainly did not intend that the authority of the executors to buy should be so used as to defeat the main object of his testamentary scheme.

Now, the law says a trustee to sell shall in no case and in no crisis be permitted to become the purchaser of the property he is authorized to sell. It is true that this rule is not prescribed by a statute, but it is rooted in justice and sound policy, and stands prominent among those great doctrines of the law which have received the approval of the general judgment of mankind as being indispensable to the promotion of honesty and fair dealing. It, therefore, has all the force which a legal rule can have. It is unnecessary to remark that no man can set aside the law by his deed or will. He may make any disposition of his property he sees fit, provided he does not attempt to contravene or overthrow the law.

Chancellor Vroom, in deciding *Fennimore* v. *Fennimore, 2 Gr. Ch. 292*, incidentally remarked that when a testator authorized his executors to purchase his real estate at public sale, and directed that a deed should be made to the purchaser by the other executor, either was at liberty to purchase, and the other was bound to carry the sale into effect by executing a conveyance to him.

It cannot be doubted that in case a trustee purchases at his own sale and conveys to a third person, and has that person to make a conveyance to himself, that his title is not void, but merely voidable. Until impeached by the *cestui que trust,* by suit, it stands as valid. In *Fennimore* v. *Fennimore,* no attempt was made to impeach or question the title of the trustee ; but, on the contrary, the complainant in that case rested his right to relief on the fact that the trustees held the lands by a valid title. The main purpose of his suit was to hold one executor, who had conveyed to the other, liable for the purchase-money the other had agreed to pay. Of course, if he had charged that no title to the lands had passed, or had insisted that the title made should be annulled, he could have made no claim for purchase-money ; he could not have both the land and its value, too. It was only on an admission that a valid title to the lands had passed, that he could lay any claim that anybody was liable for its purchase-money. The *cestui que trust* in that case did what persons occupying that position may do in every case, namely, treat the title made to the trustee as valid, and hold him liable for the purchase-money. It is obvious, then, that the question presented for judgment here was not before Chancellor Vroom, but, on the contrary, the legal rule invoked by the complainants in this case was expressly waived by the person seeking relief in that case, in order that he might hold the trustee for the purchase-money. He admitted the validity of the trustees' title to the land, in order that he might make him pay for it. The remark, therefore, of Chancellor Vroom, so far as the case under consideration is concerned, is without force or pertinency, and cannot be regarded as an authority in point except by a plain misapplication of legal rules.

But suppose it be conceded that a testator may set aside the law by his will, and that he may confer authority upon a trustee to sell, to purchase the trust property, then the question will arise, has the trustee, in this case, acquired title in conformity to the terms of the trust?   A trustee can do nothing not authorized by the terms of his trust.   The instrument which brings him into existence as a trustee, usually defines his powers and prescribes his duties.   The will, in this case, first directs that $7,000 shall be invested on the old Shurts farm for the benefit of testator's widow.   He doubtless intended not only to make a sufficient provision for her, but to provide a security which would be safe in any contingency.   So careful was he upon this point, that he expressly directs that the mortgage to be taken shall be a first lien, that it shall be made to the widow in her own name, and that she shall hold it.   These provisions show that this portion of his testamentary scheme had been the subject of careful, anxious and deliberate consideration.   His will bears date October 28th, 1872, and remained unaltered up to the time of his death in March, 1879.   It is a matter of common knowledge that, in the *interim*, a financial revolution swept over this country, which diminished the value of almost all kinds of property from one-fourth to one-half.   The authority given to the executors to sell this farm is coupled with the privilege that they may buy, and if they do, they shall not be required to pay the full legal rate of interest, but may pay interest on the $7,000, directed to be invested thereon, at the rate of six per cent.   His direction to invest $7,000 on this farm is explicit.   Equally so is his meaning that the child that purchases shall have the right to pay less than legal rate of interest; but he must pay interest on $7,000, not on a less sum.   Now, what does this indicate?   Not, of course, that the executors should invest $7,000 on a farm that was worth only $6,500; but it shows very plainly that when the testator gave his executors authority to purchase, he believed the farm to be worth a sum sufficient to make an investment of $7,000 on it perfectly safe, and that he intended, if either of them purchased, a price should be paid which would render an investment of that sum

Creveling *v.* Fritts.

on the farm secure against any contingency. According to my interpretation of this clause of the will, the authority given to the executors to purchase is limited by a clear indication of the price they should pay, and that the testator did not intend that they should exercise the right to buy unless a price was paid which would make an investment of $7,000 on the farm perfectly safe.

Oliver holds the title to the homestead farm. On his behalf it is claimed that he stands in the right of a *bona fide* purchase, made by Mr. Jacob Cregar, after the arrangement made on the 12th of November, 1879, had been abandoned. Stated more precisely, the defence is this : that Oliver, sometime in March, 1880, threw up his contract for the purchase of this farm ; that subsequently the executors made a contract to sell the farm to Mr. Jacob Cregar, who purchased with no design to convey to Oliver, but for his own benefit, and then, by a subsequent contract, entered into after his bargain with the executors was fully concluded, agreed to convey it to Oliver. The pith of the defence, it will be observed, is, that between the point where title left the executors and the point where it became fixed in Oliver, there was an honest purchase of this farm, by a third person, made for his own benefit, with no intent to convey it to Oliver, or to assist the executors in evading the law. There can be no doubt, that, if an honest purchase stands between these two points, Oliver's title is entitled to the protection of the law, and cannot be overthrown. But it is equally clear that, if Mr. Cregar's purchase was a wholly simulated proceeding, gotten up simply to conceal the real transaction, and appears to have been used merely to give the transfer of title from the executors to · Oliver the gloss of truthfulness, then it is the duty of the court to declare his title worthless. I entirely agree with the counsel for the defendant, that a sale must stand or fall by what existed at the time it was made. If it is shown to have been fair, honest and just when made, that no unlawful act was then done, and no fraudulent intent then existed, it cannot be overthrown by subsequent fraudulent acts or intents.

Now what are the facts ? The question addressed to the

10

Creveling *v.* Fritts.

court is one that always requires cautious, but fearless examination. Did Mr. Cregar make his contract for the purpose of conveying the farm to Oliver, and did Oliver consent to the sale because he believed that the purchase was made for him? No previous agreement or arrangement, effected by words, need be shown. The question is not, what did these parties openly agree to, but what did they mutually understand and intend? What mutual purpose existed in their minds? The court is bound to examine this matter in the light of ordinary experience, and with discernment enough to see whether it is a case where the words of the parties say one thing and their conduct says quite another. There are a few admitted facts bearing on this branch of the case, which, in my judgment, furnish important hints as to the direction in which search should be made for the truth. Oliver, Stires and Emanuel all desired to possess themselves of certain parts of their father's lands, and they made contracts for their purchase at prices agreed upon among themselves, after they had been advised by their counsel that they could not purchase with safety. Oliver and Stires afterwards made a further arrangement, by which a part of the lands, that it was expected Oliver would get, was to be conveyed by him to Stires. Now, it is said, that the contracts made by Oliver and Stires with the executors were subsequently abandoned, as well as the arrangement made by Oliver and Stires for the division of the lands to be conveyed to Oliver, and that they gave up all expectation of getting the lands; yet, it so turns out, by a train of fortuitous events, that they get the lands at the very time they were entitled to them under their contracts with the executors, and for substantially the same prices that they had agreed to pay the executors, but by means of independent contracts made by third persons with the executors. Such a train of extraordinary coincidences may sometimes occur in the ordinary affairs of life, but so rare are the instances that they are almost entitled to be regarded as miracles.

The facts connected with Mr. Cregar's purchase and his sale to Oliver are thus narrated by himself : He happened at Oliver's on the 30th of March, 1880. Oliver is his son-in-law. Stires

and Emanuel also happened to be there. Stires told Mr. Cregar that Oliver had thrown up his contract; he purposely refrained from asking why Oliver had done so, because, he says, he did not want to know, or to be mixed up in the matter. Stires then proposed to sell the farm to him. He says he had never thought anything about purchasing until this offer was made. He asked Stires what he wanted for it, and Stires replied, all he could get. He then offered $9,000, and Stires asked him to give $10 more, and he offered $5. At this point Oliver remarked that he didn't know that they could do any better, and thereupon the bargain was concluded. It was agreed that the deed should be delivered the next day, and the purchase-money paid. By the terms of the contract he was required to pay, in cash, a trifle over $5,100. The next day the executors and Mr. Cregar met in the village of Clinton for the purpose of performing the contract. Mr. Cregar met Oliver in the street, and he says he said to Oliver, " I am going to sell you this farm for the same that I gave, if you want it," and he says Oliver replied, " I will take it." A deed was then made by the executors to Mr. Cregar, and he at once conveyed to Oliver. Oliver paid the whole of the purchase-money to the executors. Mr. Cregar did not, in the whole transaction, pay out a penny of his own money.

Now, in the light of these facts, is it possible for any discerning mind to believe that Mr. Cregar's contract was made for his own benefit, with no intention in his mind at the time he made it of conveying the farm to Oliver, and that Oliver consented to the sale, with no expectation that the farm was to be conveyed to him? Do prudent men purchase valuable farms, at full prices, at the very commencement of the farming year? By his contract he was to pay $5,100 the next day. Before he met Oliver the next day, had he made the least effort to raise this money? If he had the money already in hand, and purchased the farm for the purpose of providing an investment, how did it happen that, when he came to offer to sell the farm to Oliver, he did not propose, as one of the conditions of the sale, that Oliver should borrow his $5,000? When told that Oliver had thrown up his contract, he says he designedly refrained from

making any inquiry why he had done so, and yet it appears that he at once entered upon the negotiation of a contract to purchase the farm. Now, if there had been no previous understanding between him and Oliver, would not the thought have naturally suggested itself to his mind that it was possible Oliver had discovered a flaw in the title of the farm, or that he had changed his mind as to its value, and would he not, in consequence, have been so curious to know the reasons which influenced Oliver's conduct, that he would have disregarded any mere considerations of taste or delicacy, and declined all negotiation until he knew? It must also be remembered that the proposal to sell was made at a very unfavorable time for the vendor. It rarely happens that a valuable farm is sold for its full value at the very opening of the farming season. Besides, Mr. Cregar says he had never previously given the purchase of this farm a thought. Had he been bargaining for himself, can it be believed that he would not have availed himself of all the advantages of the situation, or that he would have concluded a contract before he knew why Oliver had thrown up his contract, or without giving the question whether he should purchase or not much more mature consideration than he seems to have done? But there is another fact in this transaction which, in my judgment, serves to dispel all doubt about its real character. Joseph, it will be remembered, applied to Oliver, some time after the 12th of November, 1879, to ascertain whether, if he could find a purchaser who would give more for the farm than Oliver had offered, Oliver would yield up possession on the 1st of April following, and that Oliver told him he would not, unless he was compensated for the damages he would sustain by the surrender. Now, when it is proposed to sell to Mr. Cregar, although they stand at the very threshold of the 1st of April, Oliver says nothing about damages, and nothing about being permitted to remain in possession until after the contract is concluded. I regard it as incredible that he would have allowed a contract for the sale of the farm to be fully consummated without making the least effort to ascertain whether or not he would be permitted to remain in possession, if he had not fully understood that

the contract was really made for him. Whatever may have been the words uttered by these parties on this occasion, there can be no doubt respecting the thoughts and purposes of their hearts. They may have attempted to hide their real designs by a scrupulous silence respecting them ; but, looking at their conduct, scrutinizing what they did, and judging of it in the light of ordinary experience, nothing, as it seems to me, can be made more certain in human affairs than that all parties to this transaction perfectly understood that Mr. Cregar's contract was made for Oliver, and that they were going through the ceremony of making a contract with Mr. Cregar in order to give the transfer of title to Oliver the appearance of regularity.

The facts connected with the conveyance of the flax-mill property to Mrs. Margaret Fritts are too nearly identical, in all their material aspects, with those just reviewed, to make a separate discussion of them either necessary or desirable. Though Mrs. Fritts went through the ceremony of making a contract for the purchase of this property, when the contract came to be performed her husband appeared as the purchaser in fact. Of the $2,005 purchase-money, he paid $1,915. The balance was paid, it is said, with money which the husband had given to his wife. Besides, I am fully convinced that this property was conveyed to Mrs. Fritts for less than its fair value. Mr. David Mc-Clougham, whose position in this controversy entitles his judgment on this point to great weight, says that this property was fairly worth $2,500. A trustee cannot sell the trust property to himself. As the law now stands, a sale by him to his wife may not be precisely equivalent to a sale to himself, but in a case where it appears that he paid the whole of the purchase-money, and afterwards treated the property as his own, and has had the whole beneficial use of it, there is so little distinction between that and a sale to himself, except in mere matters of form, that if such a transaction were held to be valid, the rule prohibiting a trustee from purchasing the property he is authorized to sell might, for all useful purposes, be regarded as abolished.

My conclusion is that the complainants are entitled to a de-

Hill *v.* Day.

cree setting aside all the deeds. The decree will be made upon the usual terms; the purchase-money paid must be returned, and the defendants must account for rents and profits. The complainants are entitled to costs.