CHARLES H. KITCHELL et al., appellants,

*v.*

SAMUEL S. BEACH, exr., respondent.

1. The statute which provides for an issue for the trial of the question of the validity of a will, by the circuit court, does not take away the right of appeal secured by the constitution; and on such appeal the issue is to be retried in the prerogative court, as fully as if the decree appealed from were based on the finding of the orphans court itself.

2. The declarations of a testatrix, either before or after the making of her will, are not competent evidence to prove fraud in obtaining it.

3. The testator's power to make discrimination in the distribution of his property, constitutes no small part of the value of the testamentary right, and therefore considerations of inequality in such distribution are not to be entertained, where there is competency and no fraud.

Appeals from decree of Morris orphans court admitting to probate three paper writings purporting to be a will and two codicils thereto, and directing payment of costs and counsel fees out of the estate.

*Mr. H. C. Pitney,* for appellants.

*Mr. Theo. Little,* for respondent.

Kitchell *v.* Beach.

THE ORDINARY.

These appeals bring up for consideration a decree of the Morris county orphans court, admitting to probate the will of Miss Harriet Hoff, deceased, late of that county, and two codicils thereto, and they bring up also so much of a subsequent decree of that court as orders the payment of the costs, and a counsel fee of $1,500 to the counsel of the caveators out of the estate. The testatrix died on the 31st of December, 1879, at her residence at Mount Pleasant, in that county. At the time of her death she was over eighty-seven years old. The will was made on the 14th of December, 1875; the first codicil October 23d, 1876, and the last April 23d, 1878.

Caveats to the admission of the will and codicils to probate were filed, and the orphans court, on application under the statute, ordered an issue, which was tried in the circuit court of Morris county. It resulted in a verdict in favor of the will and codicils, whereupon the orphans court made its decree in accordance therewith, admitting the instruments to probate, and ordering that the costs and a counsel fee of $1,500 to the caveators' counsel be paid out of the estate. From those decrees appeals were taken to this court; from the former by the caveators, and from the latter by the proponents. The testimony in the circuit court was taken stenographically. On the hearing, the respondents moved to dismiss the appeal, on the ground that the verdict of the jury, and the decree of the orphans court thereon, are conclusive as to the merits of the controversy, and that therefore no appeal lies. The constitution guarantees to all persons aggrieved by any order, sentence or decree of the orphans court an appeal to this court. *Const. Art. VI.* § *4* ¶ *3.* And the legislature has, by statute, provided for such appeal, limiting the time for the exercise of the right. *Rev. p. 791* § *176.* The statute which provides for an issue for the trial of the question of the validity of a will, does not and cannot take away the right of appeal secured by the constitution; and on appeal the issue is to be retried here as fully as if the decree appealed from were based on the finding of the orphans court itself. *Rusling* v. *Rusling, 8 Stew. Eq. 120.*

By the will in question, which is a voluminous one, the testatrix made provision first, for the payment of her debts and funeral expenses; second, for the investment of $7,000 for the benefit of her niece, Charlotte Kinney (who then lived with her), with certain limitations over; third, for the investment of $5,000 for the benefit of her nephew, Charles Kinney, with certain limitations over; and fourth, for the investment of $1,200 for the benefit of her nephew, John Kinney (who had been absent for some time, and of whom she had no definite intelligence) in case he should appear and claim it in two years from her death, and she provided that if he should not do so the $1,200 should go to his daughter, Mary Totten, with certain limitations over. She then, by the fifth clause, gave to her nephew, Samuel S. Beach, $2,000, to be paid in one year after her death, in consideration of his many acts of kindness and attention to her, and to her deceased brother and sister, Joseph and Mary Ann, and for the service he would probably render to her during the remainder of her life. By the sixth clause she gave to George W., John and Joseph H. Kinney, and Sophronia A. Riley, children of her deceased nephew, Joseph H. Kinney, $5,000. By the seventh, to Horace B. Morehouse, son of her deceased niece, Susan M. Morehouse, $5,000. By the eighth, to Jetur, John W., James and Frank Jackson, and Laura Frost, children of her sister's son, Stephen Jackson, $3,000. By the ninth, she gave to the two children of George Jackson, son of her sister Clarissa, $1,000; all those legacies given by the sixth, seventh, eighth and ninth clauses to be paid in five years from her death. By the tenth clause she directed that $3,200 should be invested for the benefit of Margaret Canfield, daughter of her niece, Eliza Canfield. By the eleventh, she gave to Delia H. Hazard, Caroline Kitchell, Charles and Joshua M. Beach, children of her sister Jane, $3,000 each. By the twelfth, she gave to Emily B. Cochran, granddaughter of her deceased sister Jane, $1,000, and to each of Emily's six brothers and sisters $400; the legacies given by the eleventh and twelfth clauses to be paid in five years from her death. By the thirteenth clause she gave to James Smith, who, as expressed in the will, had for

Kitchell v. Beach.

many years worked for her brothers and sisters and herself with the greatest fidelity, carefulness and attention to their interests, $300, to be paid in four years from her death. By the fourteenth, she disposed of her household furniture and wearing apparel and plate and jewelry and certain mementoes, some, which are specified, to various persons relations of hers, and gave the rest to her executors to divide them up among such of her nieces, nephews, grand-nieces and grand-nephews, as might express a desire to have part thereof, within three months from her death, as equitably as they could, or the articles would admit, having due regard to the nearness of relationship. By the fifteenth, sixteenth and seventeenth clauses further limitations are made in regard to the gifts to Mary and Charlotte Kinney, respectively, in the second and third clauses. By the eighteenth, she gave to her nephew, Samuel S. Beach, all the rest and residue of her property, real, personal and mixed, of whatever kind or wherever situated, of which she might die seized or possessed, to have and to hold, to him his heirs and assigns, to his and their use forever; but she thereby charged all her estate, real, personal and mixed, therein devised and bequeathed to him, with the payment of the legacies and annuities before bequeathed, and added as follows:

" While I do not intend to forbid the sale of the lands, tenements, hereditaments and real estate herein devised to said Samuel S. Beach, or any part thereof, I prefer that no part thereof should be sold during his life, but that the whole should go to his children in such manner as he may by will direct, or as the same might descend should he die without a will; my desire being that my debts and funeral expenses, and the legacies and annuities hereinbefore provided for, shall be paid out of my personal estate, and the rents, issues and profits of the real estate devised to said Samuel S. Beach, without any sale of the real estate for that purpose; but having full confidence in the judgment of said Samuel S. Beach, and believing that he will have due regard to my known wishes, I leave him absolutely free in every respect to dispose at any time, without limitation, condition or restriction, of the estate, real, personal and mixed, herein devised and bequeathed to him, by sale or otherwise, as he may see fit; subject however to the payment of the legacies and annuities hereinbefore given and bequeathed."

29

The next, the nineteenth, clause is as follows:

" For the purpose of enabling my executors to raise and provide the money necessary for the payment of the legacies hereinbefore bequeathed, and for the creation of such funds as may be necessary to secure a support and maintenance for those to whose support my executors are directed to apply the income of the sums hereinbefore directed to be invested for such purposes, I authorize and direct my executors, after applying all such money, securities, or other personal property as I have not already in this will specifically disposed of, to the payment of said legacies or the creation of such funds or investments, to apply the rents, issues and profits of my real estate to the same purposes, giving them full power to collect such rents, issues and profits until such purposes shall be fully served; and if my said executors shall not be able, out of said personal property or estate, and out of said rents, issues and profits, to provide for the payment of said legacies at the time they shall become payable and the investments of said funds, my will is that the time of payment of all such legacies as I have heretofore in this will directed to be paid within five years after my death, shall be postponed three years; so that none of said legacies shall be payable at the discretion of my executors, until eight years after my death; but my executors shall not have power to sell any part of my real estate herein devised to my said nephew, Samuel S. Beach, for the purpose of paying said legacies, or providing for said investments. I order and direct that my debts and the expenses of settling my estate, shall be paid out of my personal estate, if sufficient for that purpose, before the payment of any of the legacies hereinbefore bequeathed."

The twentieth clause provides that should any of the legatees, except James Smith, present or bring any claim, bill or demand of any kind whatsoever against her estate, or those of her brother Joseph and sister Mary Ann, or by litigation or urging the sale or division of the real estate which such legatee might own in common with her, hinder, embarrass or interfere with the settlement of her estate or diminish its amount, such legatee shall forfeit the benefit of any provision made in the will for or to him or her, and the legacy given to him or her shall be divided among the other persons named in the will as legatees, and Samuel S. Beach, her residuary legatee and devisee, in equal proportions. The twenty-first clause provides for the substitution of children for deceased legatees, and declares that the term " annuities " is used merely to designate the provision made in the will for the investment of money for the support of per-

sons, and that such designation is not to confer any power or right on the beneficiaries to demand the payment of any particular sum at any particular time. The twenty-second clause gives to the survivors or survivor of the executors all the powers conferred on the whole number. By the last, the twenty-third, clause, she revoked all former wills and codicils and appointed her nephew, Samuel S. Beach, of Rockaway, in Morris county, before mentioned; his son, Clarence Leslie Beach, of Newark; Ephraim Lindsley, of Dover, in Morris county, and Henry J. Carr, of Jersey City, executors.

The first codicil, after reciting that she had by the will made the bequests therein contained, and had devised the residue of her estate to Samuel S. Beach, charged with the payment of the legacies and annuities, and that by reason of the general depression in business, the residue might be burdened by such charge to such an extent as to embarrass him in providing for the payment of the legacies and annuities, orders and directs that all the pecuniary legacies, including what are called annuities in the will, except those to Charlotte Kinney, Samuel S. Beach and James Smith, abate to the extent of one-fourth of their amount for the benefit of the residue. In other respects it confirms the will.

The second codicil provides that in view of the fact that Charlotte Kinney had married since the making of the will, the whole of the interest of the $7,000 to be invested for her shall be paid over to her and no part thereof be retained, and also that the executors may expend such part of the principal as they may think necessary for her comfortable support. It also provides that if Charlotte should die without issue, the $7,000 shall be divided just as it would have been had the testatrix outlived her and died intestate, excluding Samuel S. Beach from the distributees on the ground that he has been otherwise provided for; and that Charles and John Kinney's shares are not to be paid to them, but are to be managed and disposed of as she had ordered in the provision made for them respectively by the will. It provides also that interest on the $7,000 shall not begin until the end of one year from the death of the testatrix. It makes

the following reductions: The provision for Charles Kinney made in the will is reduced from $5,000 to $1,200; that for John Kinney to $500; interest not to commence until the expiration of two years from her death; the bequest in the sixth clause of the will to certain children of Joseph N. Kinney, to $1,200; the bequest of $5,000 in the seventh clause to Horace B. Morehouse, to $1,200, payable in eight years after her death; the bequest in the eighth clause to certain children of Stephen Jackson, to $1,200, payable in eight years; the bequest in the ninth clause to two children of George Jackson, to $500, payable in eight years; the sum by the tenth clause directed to be invested for Margaret Canfield, to $1,200; interest to begin at the end of two years; the bequest in the eleventh clause to certain children of Jane Beach, to $1,200 each, payable in eight years; and the bequest in the twelfth clause to Emily B. Cochran to $300, and those to her brothers and sisters to $150 each, all payable in eight years. The legacy to James Smith is revoked, and the amount carried to the residue. It provides that the principal sums ordered in the second, third, fourth and fifth clauses of the will shall not be payable until the expiration of eight years after her death, even though the persons for whose benefit they were intended should die within that period; the principal in such case to be kept invested for the benefit of those to whom it will eventually be payable. There are also some provisions in regard to her household furniture &c. It revokes the appointment of Henry J. Carr as one of the executors.

The testatrix was one of a family of seven children, of whom two sons, Charles and Joseph, and two daughters, Mary Ann and Harriet, lived unmarried. Charles died first. Joseph died in 1871 and Mary Ann in 1872. All the property of Mary Ann came to the testatrix. The testatrix's property after death consisted of her homestead (a farm containing about sixty acres of arable land, the rest woodland), a large tract of other woodland and also some smaller lots of woodland. She had also an interest in other land containing iron ore, on which a mine capable of being worked to a profit had been opened. In addition, she had some personal property. After the death of Joseph, Mary Ann ap-

pears to have had the principal part of the management ·of the property of herself and the testatrix. When she died, which was on June 30th, 1872, the testatrix was about eighty years old. From that time her affairs, especially her financial matters, appear to have been managed generally by Samuel S. Beach, her nephew, who was a man of business. He seems also to have rendered similar services ·to Charles, Joseph and Mary Ann in their lifetime.

That the testatrix was, when the will was made possessed of testamentary capacity, there can be no doubt. The testimony of Mr. Thomas Anderson, the lawyer by whom the will and codicils were drawn, and who superintended the execution of them, is clear on the subject, and not only is there no impeachment of her capacity, but her competency appears to have been admitted by the caveators on the trial before the circuit court, and is also admitted here. She transacted important business up to and in 1879, and her competency to do so seems not to have been questioned. The last codicil was made in April, 1878. She made a will and a codicil to it and a mining lease in 1872, and another will in 1874. She executed an agreement modifying a mining lease in 1876. She made a settlement with Mr. Halsey, her attorney, in December, 1876. She was examined as a witness in a land trial in 1877, and she executed another agreement modifying the mining lease in 1879. In all these transactions, and indeed so far as appears in none of her business matters at any time, was her capacity to do business in any way called in question. The instruments were executed with the requisite legal formalities. It is insisted, however, by the caveators that they were the result of undue influence over the testatrix on the part of Samuel S. Beach, the residuary legatee. The basis of the allegation is that in 1872 and 1874, as appears by the wills then made, both of which were drawn by Mr. E. D. Halsey, who at those periods was the legal adviser and attorney of the testatrix, she intended to divide the greater part of her property among her relatives by a distribution in accordance with the statute of descents, but subsequently to the making of those wills, Samuel S. Beach with a view to obtaining an alteration of

Kitchell *v.* Beach.

her will by which he might get the greater part of the property himself, imbittered her mind against Mr. Halsey, by exciting unjust and wholly unfounded prejudice on her part against him in connection with the drawing of her wills, and then induced her to make the will of 1875, by which, as has been seen, she bequeathed certain legacies and then gave the residue to him subject to the payment thereof. And 'further, that in pursuance of the same fraudulent design he, by depreciating her property to her, induced her to reduce the amount of the legacies by the codicil of 1876, and, in like manner and by like means, and to the like end and with the like design, caused the still further reduction of the legacies by the codicil of 1878. In this connection it is also charged that he induced her to reduce her intended bounty to Smith, her farmer, from the provision of the will of 1874 (the house and lot where he lived) to that of the will of 1875 ($300), and by the last codicil to revoke even that gift.

The allegation of the existence of fraud, constituting undue influence, must be proved, and the burden of proof is upon the contestants. The will and codicils having been shown to have been executed, with due formalities, by a testatrix, who was clearly competent to make them, and who was apparently free to do so, and the contestants alleging that they were procured by fraud, it is incumbent on them to establish the truth of their allegation.

Undue influence is not a presumption in such a case as this, nor is it a conclusion following from the fact that the devisee to whom the fraud is imputed was interested in the change of testamentary disposition complained of, and had opportunity to exercise influence to that end. To avoid the instruments, the influence must be proved to have existed. The declarations of the testatrix, whether made before or after the making of the instruments in question, are not competent evidence to prove fraud in the obtaining of them. *Den* v. *Van Cleve, 4 Wash. C. C. 262.* It was so held by the supreme court in 1860, in *Boylan* ads. *Meeker, 4 Dutch. 274.* And that case has ever since been regarded in this state as the leading case on the subject, and as authoritative on the point under consideration. In the

Rusling will case (a recent one) the issue was tried before the chief justice in the circuit court of Mercer county, and the law was so laid down by him, and on the appeal in this court it was so adjudged here also. *Rusling v. Rusling, 8 Stew. Eq. 120.*

There is no evidence of any coercion of the testatrix, in any way, to make the instruments under contest, or either of them. Nor is there even any evidence of persuasion, though such influence would have been entirely legitimate. There is no evidence of any misrepresentations made by Beach to her, to induce her to favor him in the testamentary disposition of her property. Nor is there any evidence that he ever made any representation to her as to the value of her estate, or any part of it. She lived for four years after she made the will, for three years after the making of the first codicil, and a year and eight months after making the second. She was visited by her friends, and her relatives had access to her during all that time. When she gave her instructions for the will and codicils, and when she executed them, she appeared to be free from all constraint and all influence. The fact on the subject of the alleged imbitterment of her mind against Mr. Halsey appears to be, that when she was about making the will of 1874, which was drawn by him, she was desirous of having two executors instead of one, as provided by the will of 1872, of which Mr. Halsey was sole executor. She proposed that Samuel S. Beach should be an executor with Mr. Halsey, but the latter refused to serve with him, and Columbus Beach was made executor with Mr. Halsey. She informed Samuel S. Beach of the matter, and he seems to have regarded the refusal to serve with him as ground for suspicion that there was something in the will that she did not understand. Mr. Halsey testifies, that Beach did not see that will until he got it from him, Halsey, on her order in 1875, as hereafter stated, and he says that unless he knew from her, he could not have known of its contents or provisions. There is no proof that the communication to Beach, of the fact that Mr. Halsey had refused to serve as executor with him, led to anything more than the expression of the suspicion just mentioned. And it appears that in fact she did not fully understand the residuary clause of the

will of 1874. When in 1875 she was about to make a new will, she sent for Judge Anderson, who was then practicing law in Dover, and who had been recommended to her by Ephraim Lindsley, an old friend of hers, to come to her and do the business for her. He came, and after converging with her on the subject, learned from her of the existence of the will of 1874. He thereupon deemed it necessary to have that will before proceeding to draw the new one, and he made another appointment to come there after the will should have been got from Mr. Halsey. She sent an order (drawn by Judge Anderson) for it by Mr. Beach, who obtained it and delivered it to Judge Anderson. When the latter read that will over to her she said, according to his testimony, that the disposition which it made of the bulk of her estate was not in accordance with her intention, but was different from what she had intended. He says:

" At the second visit, as I recollect, when this will had been produced, had been obtained, my recollection is I read the will that it is said Mr. Halsey had prepared; I read it all over to her, and I asked her about the disposition, how she wanted the property disposed of, and what her wish was with regard to such and such property; she said with regard to what I may call the residue of the estate, which was the real estate, the farm and the mines there— when I read that over she said that that was not the way she intended to have it, and my understanding was that, as I read it and explained that to her— what it said—what the legal effect of the phraseology was—that she said she did not want it that way, and then she told me how she did want it."

He also says that what he gathered was not that she had changed her mind, but that the scheme of that will was not in accordance with her idea; that her idea was that in some way or other Mr. Halsey had not written her will as she wanted it. His conclusion was, he says, that she probably did not clearly understand the effect of the disposal of that residuary estate, as it appeared in that will. The provision in question is found in the tenth and fourteenth sections of the will. The tenth section gives all the residue to the executors and the survivor in fee, in trust, to convert it into money, with full power to sell and convey at discretion, and in the meantime to lease the real estate, or so much thereof as can be leased to advantage, and for so long

Kitchell v. Beach.

a time as it can be so leased to advantage; leaving the time for
which it should continue to be leased, and the terms of leasing
to their discretion, and in further trust to receive the rents, issues
and profits, and interest and dividends of the real and personal
estate, and, after deducting for taxes, repairs, insurance, debts,
legacies and the necessary expenses of settling the estate, to
divide the proceeds of such sales with the rents, issues, profits,
interest and dividends, after carrying out the other directions
of the will, among certain persons therein named or designated;
all of them her relatives. By the fourteenth section it was pro-
vided that the executors might exercise their discretion in regard
to the division of the residue, and might make a partial division
at any time, or might wait until they should have reduced the
whole to money before making division. Nor is it surprising
that she did not understand the scheme. Mr. Halsey says she
left the matter to him; that the plan of leaving the residue to
trustees to be sold, and the proceeds divided in the discretion of
the trustees, was the same substantially in the will of 1872 as
in that of 1874; that he himself was never pleased with the
will of 1872, because it provided for division according to the
law of descents, and that he told her so; that he told her that
as she had left that to him, he wanted to say exactly in the will
how it should be left, and that he improved on it, but the plan
was the same. In reply to the question whether she understood
it, he answers, "No; I am afraid she was hardly enough of a
business woman to understand the statute of descents." He
says, however, that she understood the result—how the property
was to be divided under that will. But, however that may
have been, Judge Anderson says she told him that that scheme
of disposal was not in accordance with her wishes, that she
wanted to make Mr. Beach her residuary devisee, and charge him
with the payment of the legacies. The legacies given by the
will of 1875 amount (including that of $2,000 to Samuel S.
Beach, given in consideration of services), to over $48,000. The
first codicil reduces the pecuniary legacies, except those given to
Charlotte Kinney, Samuel S. Beach and James Smith, one
quarter; that is, to $36,000 or thereabouts, altogether. Her

reason for this, according to Judge Anderson, was that the times were hard, that property had depreciated in value, and that she wanted to reduce the amount of the legacies so as not to impose so great a burden on the residuary devisee. Judge Anderson says he talked to her some time in order to get her ideas, and that she appeared to understand, as he judged from what she said, that those legacies might be more of a burden than ought to be put on the residuary devisee. By an agreement dated September 1st, 1876, executed by her and others lessors of the mine, the royalty payable by the lessees was, in consideration of the depressed state of the iron market, very greatly reduced from that date. The first codicil is dated in October following. The testatrix's interest in the mine was the principal part of her estate. The mining stopped for want of a market in 1877 (the lessees had a right to abandon the lease on three months notice), and no money was due until after 1878. A new lease was made in 1879. The last codicil was made in April, 1878. She gave as her reason for making the further reduction of legacies and giving the extension of time made and given thereby, that the times were hard (the mine was not being worked then, because of the condition of the iron market), and that it might be that Mr. Beach, the residuary legatee, would be called upon to pay the legacies before he would have the means to pay them, and that he ought to have an extension of time, since it was uncertain when business would revive.

It is hardly necessary to say that her competency being established, no inquiry would be made for her reasons for making the changes in her testamentary disposition of her property, except in connection with the allegation of fraud. It is as much the duty of the courts to uphold the right of the owner of property to dispose of it by will according to his pleasure at his death, as it is to see to it that he is not imposed upon in the exercise of that privilege. Therefore considerations of inequality in the distribution of his estate are not to be entertained where there is competency and no fraud. Those considerations are for the testator himself, and his action on that head, if he be capable of making the testamentary disposition, and it be freely

made, is conclusive on the subject. The power to make discrimination in the destination of the property, constitutes no small part of the value of the right. In the case in hand it appears that the testatrix desired to keep the property in the family, and to give her nephew, Samuel S. Beach, the greater part of it. Judge Anderson says that when he went to see her about drawing the will, she gave him his instructions, and he did not advise her. His language is:

"I took her directions; I went there to write her will, and not to advise her; she instructed me that she desired to give to Mr. Beach the greater part of her property, particularly the real estate; I understood, or at least I suppose, that that was the bulk of the estate; and she gave me to understand that she wished Mr. Beach to have this property, to have the real estate, and that her wish was that it should not go out of the family, and that she supposed that by the arrangement that she made, and which she instructed me to incorporate in the will, the property would remain in the family; Mr. Beach, as I understand, was her nephew; her wish was that it should remain in the family, and she wished to provide for the payment of a considerable number of legacies, considerable in number and amount, and charge the payment of those legacies upon her real estate—the real estate which she gave to Mr. Beach; that is, in general terms, the idea, the wish, she expressed to me; and I recollect asking her particularly as to this power of disposition on the part of Mr. Beach, and asking whether she desired to restrict him in the disposition of it in any way; I recollect that, because the will leaves him free to dispose of it, and I recollect that particularly, because she said that she did not wish to restrict him in any way, but she gave me to understand that her wish was that he should keep the property, that it should remain in the family, and she desired to have it expressed in her will that while she did not wish to tie his hands, and wanted him to understand that taking the property in this way, he should take it knowing what her wish was, I inferred that she believed that he would respect her wishes and carry them out."

In view of his many acts of kindness and attention to her and her deceased brothers and sisters, and her confidence in and reliance upon him for assistance in her business affairs, as is witnessed by all her wills, and in view also of his relationship to her, it is not surprising that she should have made the disposition which she did of her estate in Mr. Beach's favor. In the great mass of evidence which has been adduced, I find neither any direct proof of any undue influence on his part nor

Kitchell *v.* Beach.

any evidence from which such a conclusion can justly be adduced. It is claimed on the part of the caveators that, in his management of her affairs, Mr. Beach overreached and defrauded the testatrix. The evidence does not establish the fact. She appears to have been capable of understanding her financial matters, and, according to the testimony of Richard George, she not only understood a charge which was made against Beach of having obtained a premium for the negotiation of a lease of the mine while acting for her, but she justified him in it, and that, too, on reasonable grounds. And, moreover, according to the testimony of the same witness, she had business ability enough to be careful of her own pecuniary interest in her bargains. What her liberality towards Mr. Beach may have induced her to do is a matter of no moment in this litigation. She appears, it may be remarked, to have been generous towards her relatives. His transaction of her business and dealing with her funds seem to have been satisfactory to her, and she had the capacity to understand what they were. The question here is as to his actions towards her on the subject of her testamentary disposition of her property in his favor. Nor is the fact that by the will of 1875 a legacy of $300 only was given to Smith, while that of 1874 contained a more valuable devise to him, and that by the last codicil the legacy was revoked, a matter of more concern. It would seem that the testatrix had some reason for a change of feeling towards Smith, and if she had not she was quite at liberty to do as she did. The fact appears in the testimony of Judge Anderson, that she herself directed that the legacy be given to Smith, and she herself directed that it be revoked. No evidence of undue influence is furnished by that matter. Nor, in the absence of proof of fraud, would the fact, if it were shown, that the testatrix greatly undervalued her property, weigh against the validity of her testamentary disposition of her estate ; it appearing that she had testamentary capacity and was free to act. *Collins* v. *Osborn, 7 Stew. Eq. 511.* The decrees appealed from will be affirmed. Under the circumstances, the award of costs and counsel fee to the caveators out of the estate was proper,

and the amount of the counsel fee was not excessive. The trial occupied two weeks, in addition to which much time must have been spent in preparation. No costs of the appeal will be awarded either to or against the appellants.