This suit concerns a will of hate which was executed by Robert Schmitz, late of Camden county, who died on or about December 26th, 1935. The will was executed in 1916 and a codicil thereto in 1924. It was probated on December 9th, 1937, in the Camden county surrogate's office, and the complainant, as the executor and trustee thereof, presently seeks the construction of certain of its provisions, and instructions thereon.
The testator had six brothers and sisters at the date of the execution of his will, and for two of them, his brother Otto Schmitz and his sister Emilie Schmitz Blizzard, he appears to have had an abiding hate. What his feelings towards the others were is a matter of conjecture, but he made them conditional beneficiaries of his will. Whether because he loved these latter more, or because he desired to use them as instruments to perpetuate his hatred for the other two, may best be judged from a reading of his will. Only a portion of the third clause, and the fourth, sixth and seventh clauses of the *Page 446 
will, and the second, third and fourth clauses of the codicil are necessarily pertinent to the present inquiry, and they are as follows:
"Third. All the rest, residue and remainder of my estate of whatsoever kind, whether real, personal or mixed, and wheresoever situate, and whether now owned or hereafter acquired by me, I give, devise and bequeath unto Girard Trust Company, a corporation of the City of Philadelphia, State of Pennsylvania, and its successors and assigns, In Trust Nevertheless, for the following uses and purposes, that is to say:
"In Trust, to hold, manage, rent, invest, reinvest and keep invested the corpus or principal thereof, and to demand, collect and receive the rents, interest, dividends and income therefrom and, after the deduction of all necessary charges and expenses, to pay over the net income from the date of my death, subject to the conditions and limitations as hereinafter set forth —
"One-half part thereof unto my brother, Walter A. Schmitz, One-sixth part thereof unto my sister, Bertha Schmitz, One-sixth part thereof unto my sister, Tillie Schmitz, and One-sixth part thereof unto my brother, Louis Schmitz, for and during the term of twenty years from the date of my decease, unless prior thereto my brother Otto Schmitz and his wife and my sister Emilie Schmitz Blizzard and her husband, shall all be deceased without issue, in which latter event, I direct that distribution of my said residuary estate shall be made as if the said twenty years had expired."
(Then follow certain provisions contingent upon the deaths of the respective legatees, but it is unnecessary to recite them here.)
"In Trust, upon the expiration of twenty years from the date of my death, upon their filing with the trustee under this my will a written pledge that they have complied and will continue to comply strictly with the conditions of this my Will hereinafter fully set forth, or upon the death of my brother Otto Schmitz and his wife and my sister, Emilie Schmitz Blizzard and her husband, without issue any of them surviving, to pay over and distribute the corpus or principal of my said residuary estate absolutely —
"One-half part thereof unto my brother, Walter A. Schmitz, One-sixth part thereof unto my sister, Bertha Schmitz, One-sixth part thereof unto my sister, Tillie Schmitz and One-sixth part thereof unto my brother Louis Schmitz, and in the event that any of my said brothers or sisters shall refuse or neglect to file such pledge with my said trustee, their share of my residuary estate shall be distributed unto my remaining brothers and sisters as if the one so refusing or neglecting to file such pledge were deceased without issue." *Page 447 
(Then follow other contingent provisions not now pertinent.)
"Fourth: The foregoing provisions in this my will for the benefit of my brother Walter A. Schmitz, my sister Bertha Schmitz, my sister Tillie Schmitz and my brother Louis Schmitz,or their children, are made upon the express provision and condition that no one of them shall at any time after my death and after notice of this provision of my will shall have been made known to them by my Executor, have any communication or intercourse verbally or in writing, directly or indirectly, nor live in the same house or under the same roof with my brother Otto Schmitz, his wife or children, or my sister Emilie Schmitz Blizzard, her husband or children, except such communication as shall be absolutely necessary in the settlement of my father's estate, and for no other purpose. And I direct that my said Executor shall furnish a copy of this my Will to each of my said brothers, Walter A. Schmitz and Louis Schmitz, and to my said sisters, Bertha Schmitz and Tillie Schmitz, and to the children of any of my said brothers and sisters, if any of my said brothers and sisters shall be deceased.
"In the event that any of my said brothers and sisters shall have such communication or intercourse or live in the same house or under the same roof with my said brother Otto Schmitz, his wife or children, or my said sister Emilie Schmitz Blizzard, her husband or children, I direct that the interest of such brother or sister so having communication or intercourse or living under the same roof with my said brother Otto Schmitz, his wife or children, or my said sister, Emilie Schmitz Blizzard, her husband or children, shall forthwith cease and determine as if such brother or sister were deceased without issue, on the date of such intercourse or communication, and distribution of income or principal shall thereafter be made as if such brother or sister were actually dead without issue. And I hereby authorize and empower the Executor of and Trustee under this my will to pay to any person or persons furnishing my said Executor and Trustee with conclusive evidence of communication, intercourse or place of abode as herein provided against, the sum of One Hundred Dollars ($100) my Executor and Trustee to be sole judge of the conclusiveness of the evidence, and as to the necessity for the payment of the said sum or sums of One Hundred Dollars.
"And in the event that all of my said brothers and sisters shall not accept the conditions of this my will, then I give, devise and bequeath absolutely my entire residuary estate unto the Hahnemann Medical College and Hospital of Philadelphia and its successors and
"And in the event that all of my said brothers and sisters shall not accept the conditions of this my will, then I give, devise and
"Sixth: I direct that any person named in this my will as a beneficiary thereunder who shall initiate proceedings before any official or in any Court for the purpose of changing or modifying any provision or provisions of this my Will, or for the purpose of having the same declared invalid, shall forthwith forfeit any and all interest in *Page 448 
my estate, and I direct that my estate shall thereafter be administered as if the person so contesting the provisions of this my Will had died without issue upon the date such proceeding or proceedings were initiated by him or her.
"Seventh: In the event that a Court of competent jurisdiction shall declare invalid any of the foregoing provisions of my Will as to communication and intercourse with my brother Otto Schmitz, his wife or children, and my sister Emilie Schmitz Blizzard, her husband or children, I give, devise and bequeath one-third (1/3) part or share of my residuary estate absolutely unto my brother Walter A. Schmitz and his heirs, executors, administrators and assigns forever; and two-thirds (2/3) part thereof unto the Hahnemann Medical College and Hospital of Philadelphia, and its successors and assigns forever, to endow in the hospital of the said College and Hospital as many beds as my said residuary estate will provide for."
Second, third and fourth paragraphs of the codicil:
"Second: I hereby authorize and empower my Executor to spend as much of the principal or income of my estate as may be necessary, all if need be, to defend the validity of my Will and all its provisions in case any steps should be taken to attack my said Will or any of its provisions.
"Third: I further authorize and empower the Executor of and Trustee under this my will to expend each year as much of the income of my estate, not exceeding, however, one-half (1/2) thereof, as may be required to reasonably satisfy my said Executor and Trustee that the provisions of this my Will are lived up to by the beneficiaries therein named.
"Fourth: In the Fourth Item of my said Will I provided that, in the event that all of my brothers and sisters should not accept the conditions of my Will, my residuary estate should go to the Hahnemann Medical College and Hospital of Philadelphia. This I alter to the extent that, under such conditions, my residuary estate shall be held by Girard Trust Company in trust
to collect the income, rents, issues and profits thereof and to pay over, after the deduction of all necessary expenses and commissions, the net income from my estate for the purpose of establishing as many free beds, to be known as `The Robert Schmitz Free Beds' as said income will provide."
The testator was survived by his brothers Walter and Louis and by his sisters Bertha Schmitz and Emilie Schmitz Blizzard. Louis Schmitz, however, survived testator by only a few hours. He died on December 26th, 1935, at 8:30 A.M. and the testator died five or six hours earlier. Testator's sister Tillie Schmitz died January 14th, 1922, unmarried and without issue. His brother Otto died April 1st, 1932, intestate and without issue, but leaving him surviving his widow, *Page 449 
Bertha Schmitz (referred to in the pleadings as Mrs. Otto Schmitz, to avoid confusion with Miss Bertha Schmitz, testator's sister) who is still alive and who has been appointed administratrix of the estate of Louis Schmitz. She is made a party defendant to this proceeding both in her individual and representative capacities. The other defendants are Walter A. Schmitz, Emilie Schmitz Blizzard and Hahnemann Medical College and Hospital of Philadelphia. Only the last-named defendant answered the bill of complaint and none appeared formally at the final hearing, a decree pro confesso having been entered against the non-answering defendants. The answer of Hahnemann Medical College and Hospital of Philadelphia admits all the allegations of the bill and "joins issue with the prayers" thereof. It is obvious that this proceeding was not initiated by this beneficiary within the meaning of the language of the "Sixth" clause of the will, and at the final hearing it was announced on its behalf that it was not taking an aggressive position herein and would acquiesce in whatever construction was placed upon testator's will by the court. At the request of the court Mr. Joseph J. Summerill, Jr., has filed a brief as amicuscuriae to assist in this decision.
Walter Schmitz and his sister Bertha Schmitz are the only two living legatees under testator's will, and it is clear from the proofs, I think, that neither has accepted the conditions thereof. The executor sent a copy of the will to each of them on April 17th, 1936, by mail, but received neither acknowledgment nor acceptance. More than four years had elapsed since testator's death until the time of the final hearing, and this is certainly a reasonable time within which the conditions of the will might have been accepted.
The proofs are also clear, I think, that not only have Walter and Bertha Schmitz never accepted the conditions of testator's will, but that they have violated those conditions inhibiting social and family intercourse with their sister Mrs. Emilie Schmitz Blizzard and her family. There is evidence that Bertha visited her sister Emilie in June, 1937, and attended graduation exercises with her at Bridgeton High School when Emilie's daughter Mina was graduated; that she gave Mina a graduation gift at that time and spent the night at Emilie's *Page 450 
house; that she visited Emilie again on Christmas Eve, 1938, stayed overnight and ate Christmas dinner with Emilie's family; that she gave Emilie a $5 bill for a present for the last Christmas, and gave presents to each of her three children. There is some evidence indicating that Walter Schmitz has also violated the conditions of the will by indirect social intercourse with his sister Emilie and her family.
However, neither the non-acceptance nor the violation of the condition here involved is necessary to avoid these testamentary gifts if the condition is itself illegal and void. The testator expressly provided for that contingency. We need not, therefore, concern ourselves with the question of the effect of such violation or non-acceptance unless we find the condition to be valid.
In so far as income is concerned, the requirement that all legatees accept the conditions of the will is a condition subsequent, since all provisions of the will point to a cessation of income only upon violation of the condition; but the condition is precedent in so far as corpus is concerned, because all legatees, or those claiming under them, when the corpus becomes distributable, and prior to such distribution, must file a "written pledge" that they have observed the conditions of the will during the existence of the trust, and that they will continue to do so. Clausen v. Leary, 113 N.J. Eq. 324, 327.
The acceptance of a legacy to which a legal condition is annexed makes that condition binding. 2 Jarman on Wills (5th ed.)60.
"A forfeiture clause in a will is to be strictly construed against a forfeiture and reasonably construed in favor of the beneficiary. The courts will construe a provision in a will in a way to avoid a forfeiture if it is possible to do so." 69 C.J.1782.
I think the condition here involved may be correctly classified as one in terrorem, that is, one which is designed to compel compliance with the testator's wishes through fear. Here the testator said to his brothers and sister legatees, in effect, "Shun your brother Otto and your sister Emilie, as I do, or else * * *." "In terrorem" has been described as "a convenient phrase adopted by judges to stand in the place of a *Page 451 
reason for refusing to give effect to a valid condition." Hogan
v. Curtin, 88 N.Y. 162, 171. But conditions in terrorem only, were usually held void at common law and under the civil law.Hoit v. Hoit, 42 N.J. Eq. 388, 390; 2 Williams on Executors1146; 2 Redfern on Wills, 298 ¶ 34; Theobald on Wills 425-55; 1Underhill on Wills, 673 ¶ 511; 1 Roper on Legacies (2d Amer.ed. from 4th London ed.) 794; 2 Jarman on Wills (5th ed.)45 et seq.; 2 Schouler on Wills ¶ 1350; Sheppard's Touchstone
(3d ed. 1651), 132-3; Morris v. Burroughs, 1 Atk. 399;26 Eng. Rep. 253; Reynish v. Martin, 3 Atk. 330;95 Eng. Rep. 532. And a legacy upon a valid condition was good. Godolfin,Orphans Legacy (1701) ch. XVII p. 380; Ballow, A Treatise ofEquity (1737) 27; 1 Fonblanque Equity 255 and note. A condition in terrorem annexed to a legacy of personalty did not avoid the gift; but if there was a gift over in the event that the condition was broken, the condition was allowed to prevail.Ibid. And see Phillips v. Ferguson (Va.), 1 L.R.A. 837and note.
In this country, generally "an illegal or void condition precedent attached to a devise of realty renders the devise itself void and ineffective so that the estate does not vest, even though there is no default or laches on the part of the devisee." 69 C.J. 1780; Jackson v. Knapp, 297 Ill. 213;130 N.E. Rep. 524.
"At common law, a like rule obtains as to an illegal or void condition precedent attached to a legacy out of personal estate" (In re Moore, 39 Ch. D. 116, 129), "but in equity and under the civil law, the bequest is absolute and good, the condition only being void." 69 C.J. 1780.
An illegal or void condition subsequent annexed either to a devise of realty or a bequest of personalty, unaccompanied by a gift over, is usually held inoperative as in terrorem only, and will be disregarded, and the estate or interest given will be considered as vested, absolute, and relieved of the condition.69 C.J. 1779. But a general gift of the residue is considered insufficient as a gift over. Sherman v. Richmond Hose Co.,230 N.Y. 462; 130 N.E. Rep. 613. And see Den ex dem. Trumbull v.Gibbons, 22 N.J. Law 117. *Page 452 
However, we need not here concern ourselves with fine distinctions between conditions precedent and subsequent, nor with the question as to whether the condition here imposed is interrorem only, or whether, the condition being void, the legacies should stand or fall because of the absence or presence of a gift over. The testator has himself provided, as he had the right to do, for the disposition of his estate "in the event that a court of competent jurisdiction shall declare invalid any of the foregoing provisions of my will as to communication and intercourse with my brother * * * and sister."
Paragraph "Seventh" of the will provides that in such event the residuary estate shall go, one-third to Walter Schmitz, his heirs, c., forever, and two-thirds to Hahnemann Medical College and Hospital of Philadelphia, Pennsylvania, its successors and assigns forever. If the "provisions as to communication and intercourse" are void, then this provision in paragraph "Seventh" governs. Until the validity of the condition is determined, we may entirely eliminate from our consideration the provisions touching forfeiture for non-acceptance or violation as contained in clause "Fourth" of the will and clause "Fourth" of the codicil. Clause "Fourth" of the codicil did not become operative unless a forfeiture occurred under clause "Fourth" of the will. But if the condition is void, there can be no forfeiture. Ordinarily, the legacies, being of personalty, would be held good if the conditions were void (see authorities cited supra). But here the testator has provided for alternate gifts in that event.
Fifteen questions touching the construction of testator's will are propounded by complainant; but all, or nearly all, are dependent upon that touching the validity of those provision inhibiting social family intercourse between the beneficiary brothers and sisters and those expressly disinherited by the will. While this will was conceived in hatred and born of fury, it must be construed with calmness and composure and with due regard to the testator's absolute right to dispose of his property as he saw fit, unless in contravention of law (Creveling v. Fritts, 34 N.J. Eq. 134; Turner v. Cheesman,15 N.J. Eq. 243; Dumont v. Dumont, 46 N.J. Eq. 223; Wintermute
v. Wilson, 28 N.J. Eq. 437; Kitchell v. Beach, *Page 453 35 N.J. Eq. 446, 458), or of public policy, which is the foundation of all law. Egerton v. Brownlow, 4 H.L.C. 1, 144;10 Eng. Rep. 382, 417; Holmes, the Common Law 35. And see 1Scott on Trusts 376 § 62.
The right to dispose of one's property by will is neither a natural nor a constitutional right (1 Underhill on Wills 23 ¶16) but it has been recognized in New Jersey from the earliest Colonial times. In the province of West Jersey, in 1681 (Leaming Spicer, 403, 430), and in the province of East Jersey, in 1682 (Leaming Spicer, 236, 371), laws were enacted recognizing the right as having theretofore existed; but we are usually referred to the act of the Colonial assembly of March 17th, 1714 (Paterson, Laws 5) for the original statutory authority to make a devise of lands, and to the act of November 16th, 1795 (Paterson, Laws 193), for the original statutory authority to make a will of personalty. While wills in this state originally derived their vitality from statute (Den ex dem. Mickle v.Matlack, 17 N.J. Law 86), the inhabitants of the colony of New Jersey exercised the privilege of making wills prior to any statutory enactment of which we have knowledge, probably by authority of the English statute of wills (32 Henry VIII c. 1), although it was never formally enacted in this state (per Hornblower, C.J., in Den ex dem. Mickle v. Matlack, supra). The right to dispose of chattels by will existed at common law.4 Kent. Comm. 503. It has been said that "The right of absolute dominion, which every man has over his own property, is sacred and inviolable." Turner v. Cheesman, supra. But a testamentary disposition which contravenes the law is without legal force. Moore's Executors v. Moore, 50 N.J. Eq. 554.
It has also been said that "It is trite law that, subject only to compliance with the familiar requirements of the statute, every testator may dispose of his property absolutely as he pleases and without regard to any moral or ethical consideration." (In re Kellogg, 3 N.J. Mis. R. 694, 703.) But that is not an accurate statement of the law. It is "too broadly laid down." It has been repeatedly held that any disposition of property by will contra bonos mores is void as against public policy. Graydon's Executors v. Graydon, 23 N.J. Eq. *Page 454 229, 237; Trumbull v. Gibbons, supra; Oliver v. Wells,254 N YS. 461; 173 N.E. Rep. 676; Brown v. Peck, 1 Eden. 140;Wren v. Bradley, 2 DeG. Son 49; Egerton v. Brownlow, 4H.L.C. 1, 96 (10 Eng. Rep. 398).
The phrase "contra bonos mores" is most frequently used in cases involving contracts or wagers, such as Da Costa v.Jones, 2 Cowp. 729; 98 Eng. Rep. 1331, but "whatever is bad as a covenant, or contract, must be bad as a condition afortiori." Per the Lord Chief Baron (Sir Frederick Pollock) inEgerton v. Brownlow, 4 H.L.C. 1, 140; 10 Eng. Rep. 382, 415.
However, the power to dispose of property by will includes the right to attach to testamentary gifts such terms, conditions, limitations or restrictions as the testator pleases, provided they are not contrary to public policy or forbidden by law. 69C.J. 1755. And every presumption will be taken in favor of the validity of conditions and restrictions imposed by a testator; there is no presumption of illegality. Clausen v. Leary,supra. The validity of the condition here in controversy "can in nowise depend upon the virtues or vices of the testator — much less upon the consistency of its provisions with our ideas of fairness or propriety, or even upon the principles of justice and humanity" (Den ex dem. Trumbull v. Gibbons, supra). Nor can the condition be held void merely because it may be the offspring of embittered feelings; it may be valid, and yet neither just nor generous. Ibid. And see Middleditch v. Williams, 45 N.J. Eq. 726
(reversed on other grounds, 47 N.J. Eq. 585); In reHaness' Estate, 98 N.J. Eq. 645; In re Landis' Will, 24 N.J.L.J.488; In re Eatley's Will, 82 N.J. Eq. 591.
So far as I have been able to find, there is no statutory prohibition against conditions and provisions in a will such as are here involved, and the real question is — are they void as against public policy?
The meaning of the phrase "public policy" is vague and variable. Courts have not defined it with exactness and there is no fixed rule by which to determine what acts are repugnant to it. Lord Brougham's classic definition in Egerton v. Brownlow,supra, that "public policy * * * is that principle *Page 455 
of the law which holds that no subject can lawfully do that which has a tendency to be injurious to the public, or against the public good, which may be termed * * * the policy of the law, or public policy in relation to the administration of the law," has frequently been approved. 13 C.J. 425; Broom's Comm. on theCommon Law 279. "Public policy" has been described by Burroughs, J., as "an unruly horse pursuing us, and when once you get astride of it, you never know where it will carry you."Richardson v. Mellish, 2 Bingh. 229, 252 (1824). In State
v. Bowman, 184 Mo. 549; 170 S.W. Rep. 700, it is said that "one of the best definitions perhaps is that of Mr. Justice Story, which applied the term to that which conflicts with the morals of the time, and contravenes any established interest of society" (6 R.C.L. 712 ¶ 120); but Professor Austin Scott in volume 1 of his most recent treatise on the Law of Trusts (at p. 377), says that "questions of public policy are quite nebulous. The English courts, in particular, have been troubled with the notion of applying any principle of public policy which cannot be clearly defined."
In this country, the frequent impossibility of reducing questions of public policy to a formula, and the reluctance of judges in general to make categorical statements on these matters, have not caused as much difficulty and confusion as has the failure of our courts to uniformly determine the sources of public policy. In some jurisdictions it is held that what the public policy is must be determined from a consideration of the constitution, the laws and the decisions of the courts, and that the courts are limited to a consideration of these particular sources only; and in other jurisdictions, this rule is broadened and it is held that the courts are not confined to these sources, but may also consider the conventions and customs of the people as expressed in the common law. See cases collected in6 R.C.L. 707 §§ 114 et seq.; 12 Am. Juris. 668 § 171; 50 C.J. 857 §§ 61 etseq., and 17 C.J.S. 565 §§ 211b et seq.
The limited rule is expressed in the much cited case ofHartford Fire Insurance Co. v. Chicago, Milwaukee and St. PaulRailway Co. (C.C.A. 8th), 70 Fed. Rep. 202; affirmed, *Page 456 175 U.S. 91; 44 L.Ed. 84; 20 S.Ct. 33 (1899), as follows:
"The public policy of a state or nation must be determined by its constitution, laws and judicial decisions, not by the varying opinions of laymen, lawyers or judges as to the demands of the interests of the public."
And in In re Rahn (Mo.), 291 S.W. Rep. 120; 51 A.L.R. 877,885 (1926), the Supreme Court of Missouri announced the following rule, after reviewing numerous Missouri, New York and federal cases, among which was Hartford Fire Insurance Co. v.Chicago, Milwaukee and St. Paul Railway Co., supra:
"It seems clear to us, therefore, from the great weight of judicial authority, that no act or transaction should be held to be void as against public policy, unless it contravenes some positive, well-defined expression of the settled will of the people of the state or nation, as an organized body politic, which expression must be looked for and found in the constitution, statutes or judicial decisions of the state or nation, and not in the varying personal opinions and whims of judges or courts, charged with the interpretation and declaration of the established law, as to what they themselves believe to be the demands or interests of the public."
This limited rule has been criticised and a much broader policy announced in other jurisdictions. In Pittsburgh, Cincinnati,Chicago and St. Louis Railway Co. v. Kinney, 95 Oh. St. 64, 68;115 N.E. Rep. 505; L.R.A. 1917D, 641, the Supreme Court of Ohio said:
"What is the meaning of `public policy?' A correct definition, at once concise and comprehensive, of the words `public policy,' has not yet been formulated by our courts. Indeed, the term is as difficult to define with accuracy as the word `fraud' or the term `public welfare.' In substance, it may be said to be the community common sense and common conscience, extended and applied throughout the state to matters of public morals, public health, public safety, public welfare, and the like. It is that general and well-settled public opinion relating to man's plain, palpable duty to his fellow men, having due regard to all the circumstances of each particular relation and situation. *Page 457 
"Sometimes such public policy is declared by constitution; sometimes by statute; sometimes by judicial decision. More often, however, it abides only in the customs and conventions of the people — in their clear consciousness and conviction of what is naturally and inherently just and right between man and man. It regards the primary principles of equity and justice and is sometimes expressed under the title of social and industrial justice, as it is conceived by our body politic. When a course of conduct is cruel or shocking to the adverse man's conception of justice, such course of conduct must be held to be obviously contrary to public policy, even though such policy has never been so written in the bond, whether it be constitution, statute, or decree of court. It has frequently been said that such public policy is a composite of constitutional provisions, statutes and judicial decisions, and some courts have gone so far as to hold that it is limited to these. The obvious fallacy of such a conclusion is quite apparent from the most superficial examination. When a contract is contrary to some provision of the constitution, we say it is prohibited by the constitution, not by public policy. When a contract is contrary to the statute, we say it is prohibited by a statute, not by a public policy. When a contract is contrary to a settled line of judicial decisions, we say it is prohibited by the law of the land, but we do not say it is contrary to public policy. Public policy is the cornerstone — the foundation — of all constitutions, statutes and judicial decisions; and its latitude and longitude, its height and its depth, greater than any or all of them. If this be not true, whence came the first judicial decision on matters of public policy? There was no precedent for it, else it would not have been the first."
And this is in accord with the view of Mr. Justice Holmes, that public policy in a broad sense is at the basis of most judicial decisions. He says in his famous lectures on The Common Law
(1881) (at p. 35):
"The very considerations which judges most rarely mention, and always with an apology, are the secret root from which the law draws all the juices of life. I mean, of course, considerations of what is expedient for the community concerned. Every important principle *Page 458 
which is developed by litigation is in fact and at bottom the result of more or less definitely understood views of public policy; most generally, to be sure, under our practice and traditions, the unconscious result of instinctive preferences and inarticulate convictions, but none the less traceable to views of public policy in the last analysis." See 1 Scott on Trusts 376 §62.
In Twin City Pipe Line Co. v. Harding Glass Co.,283 U.S. 353; 75 L.Ed. 1112; 51 S.Ct. 476; 83 A.L.R. 1168, 1172, the United States Supreme Court has more recently defined the sources of public policy, and has adopted a much broader rule than its rule in Hartford Fire Insurance Co. v. Chicago, Milwaukee andSt. Paul Railway Co., supra, thirty-two years earlier. Said Mr. Justice Butler, speaking for the court:
"The meaning of the phrase `public policy' is vague and variable; courts have not defined it and there is no fixed rule by which to determine what contracts are repugnant to it. * * * In determining whether the contract here in question contravenes the public policy of Arkansas, the constitution, laws and judicial decisions of that state and as well the applicableprinciples of the common law are to be considered." (Italics mine.)
In New Jersey, Vice-Chancellor Backes declared, in FidelityUnion Trust Co. v. Reeves, 96 N.J. Eq. 490; affirmed, 98 N.J. Eq. 412,
that "the principles and doctrine of public policy are matters of common professional knowledge. While the term is profound, as well as panacean in legal jurisprudence, it admits of no exact definition. Its virtue and vigor lie in its flexibility of application, and while reported cases furnish guides, they rarely are compelling in precedent."
One of the earliest expressions of public policy by our Court of Errors and Appeals is to be found in Brooks v. Cooper,50 N.J. Eq. 761 (1893), (at p. 768), wherein the court said:
"Where * * * a contract is of such a nature that it cannot be carried into execution without reaching beyond the parties and exercising an injurious influence over the community at large, everyone has an interest in its suppression and it will be pronounced void from a due regard to the public welfare. Fuller
v. Dame, 18 Pick. 472; Frost v. The Inhabitants of Belmont, 7Allen 152, 162. * * * *Page 459 
"It has been declared that public policy is a variable quality, but the principles to be applied have always remained unchanged and unchangeable, and public policy is only variable in so far as the habits, capacities and opportunities of the public have become more varied and complex. The relations of society become from time to time more complex; statutes defining and declaring public and private rights multiply rapidly and public policy often changes as the laws change, and therefore new applications of old principles are required. Davies v. Davies, 36 Ch. Div.364.
"Whatever tends to injustice or oppression, restraint of liberty, restraint of legal right; whatever tends to the obstruction of justice, a violation of the statute, or the obstruction or perversion of the administration of the law; whatever tends to interfere with or control the administration of the law as to executive, legislative or other official action, whenever embodied in and made the subject of a contract, the contract is against public policy, and therefore void and not susceptible of enforcement."
Subsequent to this decision, the same court, speaking through Mr. Justice Pitney in Dimick v. Metropolitan Life InsuranceCo., (1903), 69 N.J. Law 384 (at p. 396), asserted that it is for the legislature and not the courts to declare public policy. But Vice-Chancellor Lane, in Driver v. Smith
(1918), 89 N.J. Eq. 339, 360, thought otherwise, for he stated that "there are many things which the law does not expressly prohibit or penalize, which are so mischievous in their tendency that on grounds of public policy they are not permitted to be the subject of an enforceable agreement; that public policy varies with the time and place, and that the mere fact that a precedent cannot be found will not prevent a court from declaring a contract void as against public policy."
Perhaps the best statement as to the sources of information for the determination of public policy in New Jersey is to be found in Bigelow v. Old Dominion Copper, c., Co. (1908),74 N.J. Eq. 457. As stated by Chancellor Pitney:
"* * * the public policy of New Jersey is not occult or mysterious, nor are its sources far to seek. Subject to the *Page 460 
federal constitution and a written constitution of our own, the people of this state have adopted in the main the common law and equity system of England, and this obtains here subject to modification by the legislature. Add to these that New Jersey expects all persons and corporations subject to her jurisdiction to observe the law or abide by the consequences, and we have the public policy of New Jersey in a nutshell."
Adopting Chancellor Pitney's rule in Bigelow v. Old DominionCopper, c., Co., supra, I have examined our constitution and searched our statutes and judicial decisions, without success, for direct authority that a condition attached to testamentary gift in trust to certain named brothers and sisters of the testator, that they abstain from social and family intercourse with a brother and a sister and their respective spouses and children, expressly disinherited by the will, is void. The remaining source of our public policy is our common law, inherited from England, and adopted by our forefathers, as a part of our basic law.
Founded upon rules first established in the English ecclesiastical courts, the courts both in England and in this country, and no doubt in all civilized countries, have always been in harmony in declaring that a condition in a will in general restraint of marriage is contrary to public policy and void. Ballow, A Treatise on Equity, 1737 p. 27 ch. IV § 10; 2Coke on Littleton 24; Broom's Comm. on the Common Law (1855)280 § 367; Fonblanque Equity 255; 28 R.C.L. 321 § 309; 69 C.J.667 § 1770 b; 1 Story Equity Jurisprudence (5th ed.) 284 §264; 1 Scott on Trusts 385 § 62.6; Restatement of the Law onTrusts § 62, comment d; Sterling v. Sinnickson, 5 N.J. Law 756;Graydon's Executors v. Graydon, supra. The underlying reason for this rule is said to be "that marriage ought to be free" and that "the institution of marriage * * * will still be found to involve consequences more extensive and more seriously interesting to society than any other institution whatsoever." (See interesting note to 1 Fonblanque 255, and Montesquieu'sSpirit of Laws, book 23 ch. 2.)
Professor Scott (1 Scott on Trusts 381 §§ 62.3 et seq.) says: *Page 461 
"It is against public policy to permit a disposition of property in such manner as to offer a financial inducement to the doing of certain acts, innocent in themselves, but which ought not to be encouraged by holding out pecuniary rewards for the doing of them. * * * Thus a provision may be illegal on the ground that it tends to disrupt the family relation.
"The question is whether the settlor is unfairly using the power of his wealth to disrupt the family relation."
"It is the policy of the state to encourage the establishment as well as the preservation of the family relationship." Ibid.385 § 62.6. (Italics mine.)
In Sterling v. Sinnickson, supra, Chief-Justice Kilpatrick, speaking for the Supreme Court of this state, said:
"Marriage lies at the foundation, not only of individual happiness, but also, of the prosperity, if not the very existence, of the social state; and the law, therefore, frowns upon, and removes out of the way, every rash and unreasonable restraint upon it, whether by way of penalty or inducement."
In 1 Underhill on Wills 653 § 494, it is said:
"The preservation and protection of the family and the interests of morality imperatively demand that marriage shall be encouraged. Any principle of law which tends to the deterioration of public morals, or which encourages improper and meretricious relations between the sexes, is not only subversive of morality, but is destructive of the fundamental principles upon which modern civilized society is based. In view of these and similar considerations it is indisputable that the rule abrogating as illegal all conditions in general restraint of marriage is based not only upon the true consideration of morality, but upon a basis of sound sense and a purpose to advance the social welfare.
"The modifications which have been made in, and the limitations which have been imposed upon the general rule are intended to eliminate its seeming harshness in particular classes of cases, and to render it more adaptable to property considerations, and better fitted to promote harmony in families." (Italics mine.)
In like fashion, the courts of England and in this country have declared that a testamentary condition is void as against public policy if it is intended or directly tends to induce or bring about a future separation or divorce of husband and wife.28 R.C.L. 328 § 316; 69 C.J. 669 § 1772 c; 1 Scott on Trusts 381 §62.4; Restatement of the Law of Trusts, supra; Graydon'sExecutors v. Graydon, supra; Sheehan *Page 462 
v. Sheehan, 77 N.J. Eq. 411; Dennison v. Dennison, 98 N.J. Eq. 230; affirmed, 99 N.J. Eq. 883; Hemingway v. Ball, 118 N.J. Eq. 378; affirmed, 119 N.J. Eq. 471; Dwyer v. Kuchler, 116 N.J. Eq. 426
(cases collected).
Since the legal principle of public policy has its basis in the subserviency of the individual to the public good, in promoting the public health, morals and welfare, it is readily understandable why courts have applied this principle to encourage the establishment as well as the preservation of the family relationship.
In 69 C.J. 1769 (8) it is stated that "conditions in testamentary gifts which involve or tend to encourage the violation of the duty which one member of a family owes to another are void," citing In re Forte's Will, 267 N.Y.S. 603;149 Misc. 327, in which the court said:
"The principle is as old as the common law, that a stipulation or condition in a contract or otherwise involving a breach of duty by the obligor in relation to any matter in which a public interest is involved, is unenforceable and void." * * *
"The most frequently encountered modern application of the second principle noted by the learned Chief-Justice relates to conditions involving some violation of the duty which one member of a family owes to another. The family is the ultimate foundation upon which the soundness of the structure of the state depends. `The family is the origin of all society, and all government.' * * * People v. Olmstead, 27 Barb. 9, 33.
 * * * * * * *
"Consonant with this thought, conditions in testamentary gifts involving the violation of any such duty or which tend to `encourage such crimes and omissions' have been invalidated whenever encountered by the courts."
The principle of that decision is expressed in the following text in 6 R.C.L. 712 ¶ 120:
"That sound morality and civil honesty are corner stones of the social edifice is a truism which needs no reinforcement by argument * * * A contract is against public policy if it is injurious to the interests of the public or if it contravenes some public statute, or is against public morals * * * or, * * * if it is at war with the interests of society and is in conflict with the morals of the times." *Page 463 
The books are replete with examples of conditions which the courts have pronounced void because they were considered to be "in conflict with the morals of the times."
In DaCosta v. Jones, supra, it was held that an action would not lie upon a voluntary wager between two indifferent persons upon the sex of a third because such inquiry tends to indecent evidence and because it tends to disturb the peace of the individual and of society. Wagers were then (1778) legal in England. This wager was held contra bonos mores and therefore void. To the same effect is Gilbert v. Sykes, supra, in which Lord Ellenborough said:
"Wherever the tolerating of any species of contract has a tendency to produce a public mischief or inconvenience, such a contract has been held to be void."
In In the Matter of Boulter, 91 L.J. Ch. 250, certain testamentary benefits were given to the children of the testator's sons subject to a proviso that they should continue their residence in England and should not reside elsewhere except for periods of not exceeding six weeks in any year. The court said:
"Is it contrary to public policy that children to whom interests are given should be deprived of those interests in case they follow the fortunes of their parents should the parents go abroad?
"In my judgment, such a condition is clearly a condition contrary to public policy. It seems to me very liable to cause a father to neglect to perform his duties toward his children in such a case as has arisen in the present case; and a circumstance that I do not overlook is the possibility of the children coming by their next friend to the court and putting the case to the court as to whether they should go abroad with their father and lose their property, or should remain in England retaining the property and losing the advantage of being with their parents."
In Brown v. Peck, supra, it was held that a testamentary condition that a niece of the testator separate from her husband was contra bonos mores and void.
In White's Estate, 2 Pa. Dist. 207, it was held that a condition subsequent affecting a trust estate for a minor grandson, *Page 464 
which sought to restrain the father from performing the duty of maintaining and educating the child, was void as against public policy. Likewise an effort to restrain the father from asserting his legal rights to recover the control and custody of his child by process of law.
In In Re Carples Estate (N.Y.), 140 Misc. 459, the testator directed the trustees to pay $1,200 per annum to his daughter Barbara and an additional $1,300 for tuition and disbursements incidental to the education of said daughter at private schools, colleges, c., "as they, my said trustees, shall from time to time select." The will further directed that if the daughter either willfully or pursuant to the direction or persuasion of any guardian or custodian failed to attend such schools selected by the trustees, then said $1,300 should be paid to the American Civil Liberties Union. It was held that this, and other provisions in terrorem, "are so absolute, so vital, so calculated to separate mother and child and break down parental control and filial love and respect, and so coupled with harsh and cruel penalties, that they are undeniably against public policy and void."
In In re Vandervort's Estate, 17 N.Y.S. 316, testator provided:
"As I am in no wise pecuniarly indebted to any of my children, I do hereby order and declare as my will, that, if either or any of my sons or daughter shall present to my executors any claim against my estate other than claims for the legacies, bequests and devises provided by my will, that such son or daughter, and none of the family of such son or daughter, shall have any lot, part or share in my estate or in the distribution of the proceeds thereof, and that any and all devises and bequests made in my will to such son or daughter shall be null and void."
The surrogate found that the testator was actually indebted to a son at the date of the will and that the indebtedness had continued at the time of his death. The son proved his claim against the estate and it was paid. The condition was held unreasonable and unenforceable, and the forfeiture of the bequest inoperative.
In In re Ranney's Estate, 292 N.Y.S. 476, a condition in the codicil was as follows: *Page 465 
"In case either of my grandchildren who are now living shall at any time hereafter have any social relations or intercourse with their mother or any of her blood relations or relations by marriage, or in case the mother or any of her blood relations or relations by marriage shall be appointed the guardians of either of my said grandchildren, then I order and direct my trustees to cease paying the said grandchildren so having entered into such social relations or intercourse with his mother or her blood relations or relations by marriage any of the income which in and by my said will I have directed to be paid to my said grandchildren or either of them and to pay over the principal of the fund invested for my said grandchildren who shall have entered into such social relations or intercourse with his mother or her blood relatives or relatives by marriage in equal shares, to the parties designated in paragraph tenth of my will, or to such of them as may be living at that time. My executors and trustees, or such of them as shall have qualified and shall be acting, shall be the sole judges of the fact as to whether my said grandchildren or either of them have entered into social relations or intercourse with their said mother and her blood relatives or relatives by marriage, and the decision of my said executors and trustees as to such matter shall be final and no appeal shall be taken therefrom."
It was further provided that:
"In case my said grandchildren shall refrain from all social intercourse with their said mother, c., and either shall die without issue, his share should go to the surviving brother."
The court said:
"The language is so sweeping that if the grandchildren are not permitted to have relations with their mother, or with her relations by blood or marriage, they are prohibited from having any intercourse with any relations. Every relation of the grandchildren is a relation of their mother's by blood or marriage. The condition is impossible to perform and is against public policy. No party to this proceeding seeks to enforce it. The condition is invalid and unenforceable."
Most of the cited cases have to do with conditions requiring breach of duty arising out of the marriage relation, either duties of the husband and wife to each other, or of parents to children; and it may be argued that brothers and sisters do not owe each other the duty of social intercourse, and that therefore the conditions here involved do not fall within Chief-Justice Parker's second classification in Mitchell v. Reynolds, 1 P.Wms. 181, cited in In re Forte's Will, supra. *Page 466 
It is to be noted that the pertinent provisions of our Poor act (R.S. 44:1-140-1) compelling support by relatives do not make brothers and sisters so chargeable for the support of each other. So far as I know there is no New Jersey statute making brothers and sisters liable for the support of indigent brothers and sisters except to the extent and as provided in the act concerning lunatics (R.S. 3:21-7). Although this statute has never been repealed, its constitutionality was questioned, but not passed upon, by Chancellor Walker in In re Rogers, 96 N.J. Eq. 6.
But while there is, perhaps, no legal duty on the part of the brother and sister legatees of the Schmitz will to associate or have social or family intercourse with the proscribed brother and sister, and their respective families, if the public is interested in the maintenance of harmony in the family, and if the family is the cornerstone of civilization, as is claimed by reputable authorities, then there is at least a moral duty upon the various brothers and sisters to treat one another with cordiality, at least, and any condition which tends to make any one of these individuals violate this moral duty should, on principle, be held to be contra bonos mores and void. And, in this connection, we should bear in mind that the prohibition of the condition here involved extends beyond the present generation and applies with equal force to the children, born or unborn, of the favored legatees, and of the brother and sister expressly disinherited by the will.
Counsel for complainant calls attention to the case ofRidgeway v. Woodhouse, 7 Beav. 436, cited in 69 C.J. 1769, in support of the statement that "a condition against the wife's sister residing with, or dwelling in the house or place of residence of, the wife, is not illegal," and suggests it as authority indicating the legality of the condition here under consideration. I am unable, however, to give this decision the force claimed for it by counsel for the complainant.
In that case testator devised the income of certain lands to his wife for life or during her widowhood, and provided that if the sister of his wife should, during that period, "reside with or dwell in the house or place of residence of the wife or become a part of her family, then and in any such *Page 467 
case and for each and every day during which the sister should reside with or dwell in the house or place of residence of his wife or become a part of her family, his trustees should retain from and out of the * * * moneys, payable * * * to his wife * * * the sum of £100 and when so retained pay the same to a charity." Lord Langdale, Master of the Rolls, held that this condition as to the sister's residence was a condition subsequent which, if enforced, would divest an estate previously vested and that it ought, therefore, to be strictly construed. He held that the testator's purpose in imposing the condition could not be affected because of the provisions of the Mortmain act, and that it was, therefore, void. At the conclusion of his opinion, Lord Langdale said: "I cannot say I think the condition itself was an illegal condition." This statement was obviously dictum, as he had already held the condition void because the direction to pay retained money to charity was illegal, and therefore the condition was impossible of performance. Conditions impossible of performance have been held void from the earliest times. See 1Britton (Nichols) 239; Plowden's Com. 32, 133; Sheppard'sTouchstone, supra; Coke on Littleton 206; 2 Jarman on Wills 10;
and see, also, Frost v. Blackwell, 82 N.J. Eq. 184; TrentonTrust and Safe Deposit Co. v. Armstrong, 70 N.J. Eq. 572; 69C.J. 681 § 1798; In re Ranney's Estate, supra; 1 Underhill onWills, 646; 28 R.C.L. 320 ¶ 308.
It is to be noted that this dictum was delivered in 1844, and was not a part of the common law of England at the time of the adoption of our constitution and when the English common law was adopted bodily as a part of our jurisprudence. The decision is not binding on this court.
Another circumstance which impels me to give little weight to this dictum is the fact that in the same will "the testator gave to his sister Alice Harrison the clear yearly sum of £400. But he provided that in case Thomas Harrison, son of his said sister, should, at any time after his decease and notice to his said sister of this condition, reside with his said sister, or dwell in her house or place of residence, or become part of her family, the bequest therein-before contained for *Page 468 
her benefit should cease and become void, as if she were actually dead." I think there are but few, if any, jurisdictions in which such a condition would be held valid, and yet no comment thereon whatever is made in the court's opinion; perhaps it was not in issue, but both conditions were obviously in terrorem, and if one were void certainly the other should be held to be.
There is, however, another later English case, Jeffreys v.Jeffreys, 84 L.T. Rep. 417, decided in 1901, which, I believe, sets at naught the supposed authority of the decision inRidgeway v. Woodhouse, supra. In the Jeffreys Case the testator gave his residuary estate to trustees to pay the income to K for life and after her death to divide the corpus amongst her children. By a codicil he declared that if she "shall in any way associate, correspond or visit with any of my present wife's nephews or nieces or their husbands or wives respectively, or if she shall to the knowledge of my said trustees, entertain or exercise hospitality to them, or in any way contribute to the maintenance of any house in which they or any of them reside or are or shall be at any time entertained or received as visitors or guests, then and in such case all the estate and interest of my said daughter under my said will shall be forfeited and cease and determine." Then followed a gift over. The bequest was to a daughter by testator's first wife. The prohibition was against associating with the second wife's nephews and nieces, cousins of the legatee by marriage only. There was no prohibition of social relations or family intercourse amongst blood relations, as here, and yet the court found no difficulty in holding this condition void. It is true that the court based its decision, not upon the ground that the condition was against public policy and therefore void, but that it was void for uncertainty. I quote the following from the court's opinion:
"In Claverling v. Ellison, 7 H.L.C. 707, Lord Cranworth says: `I consider that from the earliest times one of the cardinal rules on the subject has been this; that where a vested estate is to be defeated by a condition on a contingency that is to happen afterward, that condition must be such that the court can see from the beginning precisely and distinctly *Page 469 
upon the happening of what event it was that the preceding vested estate was to determine.'
"Can I predicate beforehand what she may or may not do in view of these conditions? Even if the conditions were separable and I could find one clear case it might be different. But there is not one single thing which is absolutely clear, so that one cannot predicate which she may or may not do. Taking, for instance, the word associate — does that mean simply for pleasure or business, or both? Again, it is said that she may not `visit.' Suppose one of these persons was inspired with a particular spite which was gratified by forcing his company on the lady: is it to be said that that was a case of forfeiture? These points show that there is so much doubt as to the condition of defeasance of the estate that they ought to be construed strictissimi juris. I cannot say that they are capable of being defined with certainty.
"Again, with regard to the maintenance where any of the nephews or nieces resided, it is impossible to say strictly what is the meaning of these words. And the same remark applies to `receiving as visitors or guests.' It is absurd to say that a clause such as this, which is capable of no precise meaning, should be allowed to operate as a forfeiture. I therefore determine that it is void."
I apprehend that had the condition there involved prohibited social intercourse between the legatee and her brother and sister, or other blood relation, the court would not have hesitated to declare the condition void as against public policy; but whatever might have been the result in that case had the facts been as suggested, I believe the decision to be sound law and the language of the court is peculiarly applicable to the instant case, and I consider it direct authority for holding the condition here under consideration void for uncertainty.
Reference to the foregoing-recited condition of this will shows that it provides for the distribution of the corpus at the expiration of twenty years by requiring the brother and sister legatees to file with the trustees "a written pledge that they have complied and will continue to comply strictly with the condition," upon pain of forfeiture for refusal or neglect *Page 470 
to do so. Thus social intercourse between the favored and unfavored members of this family is prohibited so long as any of said legatees are living, and as already pointed out this prohibition extends to the children, born or unborn, of both classes of brothers and sisters. It is a harsh requirement, to say the least, and is hardly consonant with the Pauline doctrine (Romans 12:10) nor with the principles of the Sermon on the Mount (Matthew 5).
Assuming that the condition became effective and binding on the legatees, how could it be enforced after distribution? And on the question of uncertainty, the language of the court in Jeffreys
v. Jeffreys, supra, might well be paraphrased here. "What is the meaning of the words `live in the same house or under the same roof with my brothers * * * or my sister?'" c., and "what is the meaning of the words `except such as shall be absolutely necessary in the settlement of my father's estate?'" Note, also, that in the second paragraph of clause "Fourth" of the will, the forfeiture clause, the words "or their children," following the names of the brother and sister legatees, are omitted after the words "In the event that any of my said brothers and sisters,"c. Does that leave these children free to disregard the condition? Will their violation of the condition bring the penalty of forfeiture upon their own heads, or only upon those of their parents? Who is to be the judge as to the compliance or non-compliance with these conditions? Not the trustee — the provision that the trustee is to be "sole judge," at the end of the second paragraph of clause "Fourth," relates only to the right of an informer to collect a reward for his perfidy. Nor do I think the language of the "Second" clause of the codicil, whereby the trustee is empowered to expend one-half of the income of the trust estate in spying on the beneficiaries, can be construed to confer upon the trustee the exclusive right to determine that the condition has been observed or violated. If not, then the burden of such decision might, in the final analysis, be cast upon this or some other court of competent jurisdiction. But the requirements of the condition are entirely too uncertain for any court to assume that burden, and the condition may, therefore, be held void for uncertainty. *Page 471 Jeffreys v. Jeffreys, supra. And see 69 C.J. 661 ¶ 1756.
Uncertainty is fatal to any provision in a will. 28 R.C.L. 209 ¶170.
However, as I believe I have already indicated, I am of the opinion that the condition is void as opposed to public policy. And the mere fact that an exact counterpart of this case cannot be found in the books will not prevent the court from declaring the condition void as against public policy. Driver v. Smith,supra. The lack of a precedent is never a bar to equitable relief. Federal Title and Mortgage Guarantee Co. v.Lowenstein, 113 N.J. Eq. 200; Vanderbilt v. Mitchell, 72 N.J. Eq. 910; Earle v. American Sugar Refining Co., 74 N.J. Eq. 751.
The testimony does not disclose any reason why the testator desired one group of his brothers and sisters to avoid social and family intercourse with another group. There is no evidence that the testator had quarreled with his brother Otto or his sister Emilie who became the objects of his testamentary "embittered feeling." In fact, Emilie testified that it must have been close to thirty years since she last saw testator prior to his death. Her only reason for his dislike of her, she testified, was because she once had asked him for an accounting of a relative's estate of which she was a beneficiary. It may be that the testator's soul was "seared by the burning lava of human passions" (Den ex dem. Trumbull v. Gibbons, supra); but be that as it may, the fact remains that this condition inhibiting social intercourse between certain members of the Schmitz family is as shocking and harsh as it is unusual, and the court will not lend its hand to help the testator use the power of his wealth to disrupt this family. 1 Scott on Trusts, supra. Because society is interested in marriage and the creation of the family relationship, it condemns all general restraints placed upon them by the contracts and testamentary dispositions of individuals; and because society is likewise interested in the continuance of the marriage relationship, it condemns contracts and testamentary dispositions of individuals tending to induce or bring about a future separation or divorce of husband and wife. It is not a far-flung cry from these more or less definitely understood views *Page 472 
of public policy to say that society condemns all acts, be they contractual or testamentary, which tend to disturb the peace and harmony of families and to make inharmonious that which the state is interested in creating and preserving. "As are families, so is society."
Since "the family is the origin of all society and all government" (In re Forte's Will, supra), the protection of the family being the paramount purpose of all government and laws (People v. Olmstead, 27 Barb. 9, 33), any act, be it in the form of covenant, contract, or condition, testamentary or otherwise, which tends to disrupt the family must be held, on principles of the common law, to be void as against public policy. 1 Scott on Trusts, supra. I therefore hold that the condition of the Schmitz will here under consideration is void because its provisions are opposed to the public policy of this state. I also hold the condition to be void because of the uncertainty of the meaning of its provisions, and the resultant difficulty of enforcement in this or any court of competent jurisdiction.
The testator has said in plain language that he did not want the brother and sister legatees named in clause "Third" of his will to take his property except upon the condition therein expressly set forth. If this condition were held invalid, then, and in that event, he preferred an entirely different and less complicated scheme of disposition of his estate. This alternative scheme he expressed in paragraph "Seventh" of his will, in plain and understandable language, as it was his undoubted right to do.
The condition having been held void, paragraph "Seventh" of the will controls, and one-third of testator's residuary estate passes absolutely to Walter A. Schmitz, his heirs and assigns, and two-thirds passes absolutely to Hahnemann Medical College and Hospital of Philadelphia, its successors and assigns, to endow beds in the said hospital.
The "Fourth" paragraph of the codicil alters only the "Fourth" paragraph of the will and does not change the testator's disposition in paragraph "Seventh."
I shall advise a decree in accordance with these views. *Page 473